DAL–CHROME COMPANY, Appellant

v.

BRENNTAG SOUTHWEST, INC. f/k/a
Advanced Chemical Distribution, Inc.
d/b/a HCI Advanced Chemical Distri-
bution, Inc., Appellee.

No. 05–03–01643–CV.

Court of Appeals of Texas,
Dallas.

Jan. 27, 2006.

Robert C. Jenevein, Douglas & Cole, P.C., Brady & Cole, P.C., Dallas, for Appellant.

Kurt Howard Kuhn, Craig A. Morgan, Virginia K. Hoelscher, Brown McCarroll, L.L.P., Austin, for Appellee.

Before Justices MORRIS, MOSELEY, and FITZGERALD.

## OPINION

Opinion by Justice MOSELEY.

Dal–Chrome Company bought sulfuric acid from Brenntag Southwest, Inc. for use in its business. Later it sued Brenntag under the Deceptive Trade Practices–Consumer Protection Act ("DTPA"), asserting that the acid had been contaminated. Brenntag counterclaimed for unpaid invoices for chemicals it sold to Dal–Chrome. Based on a jury verdict in favor of Dal–Chrome and the parties' stipulation on Brenntag's counterclaim, the trial court entered judgment for Dal–Chrome for economic damages, additional damages, prejudgment interest, and attorneys' fees after offsetting Brenntag's damages, prejudgment interest, and attorneys' fees on its counterclaim. Both parties appeal. In three issues, Dal–Chrome asserts the trial court erred by: (1) offsetting Brenntag's damages from Dal–Chrome's actual damages before calculating the limit on DTPA additional damages; (2) awarding Brenntag attorneys' fees because the fees were not segregated between fees incurred in its unsuccessful defense of the DTPA claim and fees incurred in presenting the counterclaim; and (3) awarding post-judgment interest at a lower rate than the rate in effect at the time from which the parties agreed post-judgment interest would be calculated. Brenntag brings three issues arguing the evidence is legally and factually insufficient to support the jury's findings (1) that Brenntag violated the DTPA, (2) that it did so knowingly, and (3) of the amount of Dal–Chrome's benefit of the bargain damages. Brenntag's fourth issue asserts the trial court erred by awarding Dal–Chrome economic damages plus treble damages resulting in an award of quadruple damages.

For the reasons set forth herein, we modify the trial court's judgment to avoid

the award of quadruple damages, and affirm the judgment as modified.

## BACKGROUND

Dal–Chrome sells refurbished and new chrome bumpers for motor vehicles. It uses various industrial chemicals in the chrome plating process. One of those chemicals is 93 percent tech grade sulfuric acid, which it uses to control the pH level in the plating baths. (Tech grade is the lowest grade of sulfuric acid and also the least expensive.) In 1998, Dal–Chrome started buying its sulfuric acid and other chemicals from Brenntag. Thereafter, several bumpers were rejected because the chrome was clouded or hazed after being plated. Other bumpers appeared acceptable, but were later returned after customers reported problems with the chrome peeling or becoming discolored. Over 400 bumpers were affected. Dal–Chrome claimed the sulfuric acid sold by Brenntag was contaminated, causing the plating process to fail. Dal–Chrome sued Brenntag for violations of the DTPA and for breach of warranty. Brenntag counterclaimed for unpaid invoices for chemicals sold to Dal–Chrome.

After resting its case, Dal–Chrome stipulated the invoices comprising Brenntag's counterclaim were unpaid. After the close of the evidence, Dal–Chrome stipulated that the amounts on the invoices were due and owing to Brenntag; thus the counterclaim was not submitted to the jury.

The jury found that Brenntag had violated the DTPA by misrepresenting the quality and characteristics of the sulfuric acid, engaged in unconscionable conduct, and failed to comply with its warranty, all causing damages to Dal–Chrome. The jury also found Brenntag committed these acts knowingly. The jury determined Dal–Chrome's actual damages totaled $99,840.55 and awarded $750,000.00 as ad-

ditional damages based on the knowing finding. The jury also found the reasonable and necessary attorneys' fees for Dal–Chrome in prosecuting its claim through trial were $165,000, and for Brenntag in prosecuting its claim through trial were $80,000.

Dal–Chrome moved for judgment on the verdict and Brenntag moved for judgment notwithstanding the verdict. The parties agreed to postpone the hearing on the motion for judgment; their agreement stated that "any post-judgment interest awarded shall be calculated beginning May 27, 2003."

The trial court rendered judgment on October 24, 2003. It calculated the judgment by subtracting Brenntag's damages on its counterclaim (as stipulated by the parties) from Dal–Chrome's actual damages (as found by the jury) to arrive at a net actual damage amount for Dal–Chrome. The trial court then trebled this amount to determine the statutory limit on additional damages under the DTPA. TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.2005). The judgment then totaled Dal–Chrome's net actual damages, the limited additional damages, Dal–Chrome's prejudgment interest, and its attorneys' fees. From this total, the judgment subtracted Brenntag's prejudgment interest on the counterclaim and Brenntag's attorneys' fees as found by the jury. The judgment awarded post-judgment interest on the net award to Dal–Chrome at the rate of ten percent per annum beginning May 27, 2003 as agreed by the parties.

Brenntag filed a timely motion for new trial. More than thirty days after the judgment was signed, Brenntag filed a motion to modify the judgment to reduce the post-judgment interest rate from ten percent to five percent per annum because the judgment was rendered after the effective date of the recently amended post-judg-

ment interest statute. Tex. Fin.Code Ann. § 304.003 (Vernon Supp.2005). On January 16, 2004, during the period the trial court retained plenary power over the judgment, the trial court modified the judgment to reduce the post-judgment interest rate from ten percent to five percent, calculated from May 27, 2003. Both parties appeal the modified judgment.

## DISCUSSION

### 1. Sufficiency of the Evidence

■ We begin with Brenntag's legal and factual sufficiency issues. Brenntag's first three issues argue the evidence is legally and factually insufficient to support: (i) any of the liability findings against it; (ii) the "knowing violation" finding; and (iii) one element of Dal–Chrome's economic damages finding. To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994); *see also St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex.2002) (plurality op.). We view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005).

■ To evaluate the factual sufficiency of the evidence to support a finding, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). This Court, however, is not a fact finder, and we may

not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

### a. Liability Findings

■ In its first issue, Brenntag challenges each of the jury's liability findings. We address the jury's finding in response to question one: that Brenntag represented that the sulfuric acid had characteristics, ingredients, uses, or benefits that it did not have or that the sulfuric acid was of a particular standard, quality, or grade when it was of another.

■ The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com.Code Ann. § 17.46(a) (Vernon Supp.2005). Section 17.46(b) is a laundry list of specifically prohibited acts. *See* Tex. Bus. & Com.Code Ann. § 17.46(b). Sections 17.46(b)(5) and 17.46(b)(7) prohibit "false, misleading, or deceptive acts or practices [including] ... representing that goods and services have ... characteristics, ingredients, uses, [or] benefits ... which they do not have" and "representing that goods or services are of a particular standard, quality, or grade ... if they are of another." Tex. Bus. & Com.Code Ann. § 17.46(b)(5) & (7). Actionable representations may be oral or written. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex.2001). A party need not prove intent to make a misrepresentation under sections 17.46(b)(5) or 17.46(b)(7); rather, the act of making the false representation is itself actionable. *Helena Chem. Co.*, 47 S.W.3d at 502; *Smith v. Baldwin*, 611 S.W.2d 611, 616–17 (Tex.1980); *Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d

804, 822 (Tex.App.-Dallas 2003, pet. denied).

Brenntag argues the evidence is legally and factually insufficient to support this finding because it represented only that the sulfuric acid would be tech grade 93 percent and that is what it delivered. Dal–Chrome agrees it ordered—and received—tech grade 93 percent sulfuric acid, but argues the acid was contaminated with organic material and other substances. Brenntag contends that Dal–Chrome failed to prove the manufacturer's specifications for the acid and thus there is no evidence the acid did not meet those specifications.

The record indicates Brenntag told Dal–Chrome that it would provide next-day delivery, competitive pricing, and quality products. Brenntag also gave Dal–Chrome a brochure that stated in part, "All products ... being delivered to customers must meet the manufacturer's product specifications. Making sure that the specifications are met is the purpose of quality control." However, the evidence indicates that Brenntag's quality control procedures did not involve any testing of the sulfuric acid to determine whether it met product specifications before it was delivered to the customer. Instead, Brenntag's procedures consisted of taking a retain sample of the acid and obtaining a certificate of compliance for the acid from Brenntag's supplier. A certificate of compliance states the assay or concentration of the acid and contains a pre-printed list of the maximum limits for several substances. According to Brenntag it is common practice in the industry to rely on these certificates and representations by suppliers and manufacturers about the contents of the chemicals delivered.

Dal–Chrome told Brenntag the types of chemicals it had been using, received price quotes, and began ordering from Brenntag. Prior to delivering the sulfuric acid to Dal–Chrome, Brenntag took a retain sample of the acid and obtained a certificate of compliance for the acid from its supplier, a company called Fe3. The certificate stated the concentration of the acid was 94 percent-above the minimum for tech grade sulfuric acid. (This certificate was not provided to Dal–Chrome until after the problems arose. A witness for Dal–Chrome said Brenntag's salesman represented the certificate as the manufacturer's specifications.)

After Dal–Chrome starting using the Brenntag-supplied acid, it experienced problems controlling the pH levels in the plating baths. It also experienced problems with hazing, flaking, and adhesion of the chrome plating to the bumpers. A consultant determined these problems were caused by the sulfuric acid, based on his ability to reproduce the problems in the laboratory using the acid in question. Further, after Dal–Chrome switched to another supplier for tech grade 93 percent sulfuric acid, the pH control returned to normal and the plating problems gradually stopped.

Dal–Chrome met with Brenntag in June of 1998 to discuss the problems. Brenntag indicated it would "stand behind" its product if something was wrong with it, but contended Dal–Chrome's problems were caused by something else. Nevertheless, Brenntag accepted the return of some of the sulfuric acid and issued a credit memo to Dal–Chrome for the purchase price of the returned acid. At the meeting, the parties discussed testing the acid with independent laboratories, apparently to compare the results.

Dal–Chrome hired an expert to test both the sulfuric acid from Brenntag and the sulfuric acid from another supplier that Dal–Chrome was using without problems. The expert testified that while tests

showed both samples were 93 percent sulfuric acid, the Brenntag acid contained elevated levels of iron, nitrates, and organic matter compared to the other sample. Based on the test results from other laboratories and his own tests, the expert specifically testified that the sulfuric acid in question did not comply with the manufacturer's specification. On cross-examination, the expert testified he did not know who the manufacturer of the acid was and that he did not believe Brenntag's supplier, Fe3, manufactured sulfuric acid.

After the meeting, Brenntag had the acid returned by Dal–Chrome tested. The results showed the levels of iron, nitrates, nickel, and antimony were higher than the maximum limits shown on the Fe3 certificate. Then—and for the first time—Brenntag had the retain sample of the acid tested for its chemical composition. Those tests also showed levels of iron, nitrates, nickel, and antimony higher than the maximum limits on the Fe3 certificate. Shortly after Brenntag received those test results, it sent a letter to Fe3 describing Dal–Chrome's problems with the acid and stating that earlier and later shipments of sulfuric acid did not show the same results. The letter indicated the retain sample-taken directly from the tanker—did not comply with the specifications in the certificate. Brenntag stated it would not accept responsibility for the losses associated with the acid shipment and requested Fe3 to review Dal–Chrome's damage claim.

There is evidence Brenntag represented the acid would meet the manufacturer's product specifications and that Brenntag would perform quality control measures to make sure those specifications were met. Although the evidence indicates the sulfuric acid sold to Dal–Chrome was 93 percent sulfuric acid, there was evidence the acid was contaminated with other substances, and that before Brenntag delivered the acid it did not perform any quality control measures to make sure the product specifications were met. There is evidence Brenntag represented it would provide Dal–Chrome with the same chemicals Dal–Chrome had been using, but that the sulfuric acid supplied did not meet that representation. Thus, there is evidence Brenntag represented the sulfuric acid had characteristics, ingredients, uses, or benefits that it did not have or that the sulfuric acid was of a particular standard, quality, or grade when it was of another.

Brenntag argues that it represented only that the acid would meet the manufacturer's specifications and there was no evidence of the actual manufacturer's specifications for these alleged contaminates. Thus, the argument goes, the evidence does not show that Brenntag represented the acid would not be contaminated with these substances. However, the record indicates it is common practice in the industry to rely on certificates from suppliers as to the content of chemicals delivered, that the acid at issue did not meet the specifications set forth in the certificate, and that Brenntag used the failure to meet those specifications to make a claim on Fe3 to cover Dal–Chrome's losses. There is also evidence that Brenntag represented to Dal–Chrome that the Fe3 certificates were the manufacturer's specifications. Based on the evidence in the record, the jury could have reasonably concluded those representations were false.

■ Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude the evidence is legally sufficient to support the jury's verdict. *City of Keller,* 168 S.W.3d at 830. Further, while there were some conflicts in the testimony, we will not substitute our judgment for that of the jury's. *Golden Eagle Archery, Inc.,*

*v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003) ("[T]he jury is the sole judge of the credibility of witnesses and the weight to be given their testimony."). It is the jury's role "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses." *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 563 (1952). After reviewing all the evidence, we cannot say the evidence is so weak that the jury finding is clearly wrong and unjust. Thus the evidence is factually sufficient to support the jury's finding in response to question one. We need not address Brenntag's challenges to the other liability findings. TEX.R.APP. P. 47.1. We resolve Brenntag's first issue against it.

### b. *Knowing Violation Finding*

■ The jury found that Brenntag represented the sulfuric acid had characteristics, ingredients, uses, or benefits that it did not have or that the sulfuric acid was of a particular standard, quality, or grade when it was of another. Conditioned on this finding, the jury was asked "Did [Brenntag] engage in any such conduct knowingly?" The jury was instructed, without objection, that:

> *"Knowingly"* means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. *Actual awareness* may be inferred where objective manifestations indicate that a person acted with actual awareness.

*See* TEX. BUS. & COM.CODE ANN. § 17.45(9) (Vernon 2002). The jury answered "Yes." Brenntag's second issue challenges the legal and factual sufficiency of the evidence to support this finding.

■ The supreme court has described the meaning of actual awareness under the DTPA:

> "Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway".

*St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co.,* 974 S.W.2d 51, 53–54 (Tex.1998). Actual awareness is more than conscious indifference to another's rights or welfare. *Id.*

Dal–Chrome argues the "knowing violation" finding is supported by evidence that, although Brenntag represented the acid would conform to the *manufacturer's* specifications, and that "[m]aking sure that the specifications are met is the purpose of quality control," the acid in fact did not live up to Brenntag's representations and Brenntag's standard procedure was not to test the acid unless a customer had a particular specification. The record reflects Brenntag represented its products would meet the manufacturer's specifications and that its quality control measures would make sure those specifications were met. Yet, there is evidence that Brenntag was aware it would not test sulfuric acid before delivery to customers and that its quality control procedures did not call for testing of the acid before delivery to customers. There is evidence that Brenntag represented its quality control procedures would ensure the acid met the manufacturer's specifications when in fact those quality control procedures did not require any testing for compliance with manufacturer's specifications.

The jury could have reasonably inferred that Brenntag knowingly led Dal–Chrome

to believe that Brenntag's quality control measures would make sure that the acid complied with the manufacturer's specifications, and that Brenntag was aware this was deceptive and unfair because it did not test for compliance with specifications but merely relied on its supplier's certificate of analysis. Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude the evidence is legally sufficient to support the jury's finding. *City of Keller,* 168 S.W.3d at 830.

Brenntag argues the evidence is insufficient because the measures it took to insure product quality met or exceeded the standard practices in the industry. Brenntag also asserts that if Dal–Chrome had had any specifications for the sulfuric acid, Brenntag would have tested for those specifications. There was evidence that Brenntag took steps to avoid contamination when it took delivery of sulfuric acid (such as cleaning the drums used to store sulfuric acid between uses and using dedicated hoses to transfer the sulfuric acid) and performed a visual inspection of the retain sample before shipping. However, there was evidence that these procedures would not disclose whether the acid was contaminated and would not verify that the manufacturer's specifications were met. Brenntag did not test sulfuric acid for compliance with specifications unless a customer had a specific requirement and requested such testing.

Moreover, the record indicates Brenntag represented it would stand behind the acid if anything was wrong with it, but did not disclose the results of its testing of the acid returned by Dal–Chrome and of the retain sample until after this litigation was filed. The jury heard evidence that the regional manager for Brenntag testified in his deposition that Brenntag does not make a blanket statement that every product a customer buys will meet manufacturer's specifications. Brenntag's product brochure stated, however, that "all products ... delivered to customers must meet the manufacturer's specifications." The jury could reasonably infer from the evidence and objective manifestations that Brenntag had actual awareness of the falsity, deception, or unfairness of its conduct at the time of the conduct. *See* TEX. BUS. & COM.CODE ANN. § 17.45(9).

After considering all the evidence we cannot say the evidence is so weak that the jury finding is clearly wrong and unjust. Thus there is factually sufficient evidence to support the jury's finding that Brenntag knowingly engaged in conduct violating the DTPA. *See Houston Livestock Show & Rodeo, Inc. v. Hamrick,* 125 S.W.3d 555, 584 (Tex.App.-Austin 2003, no pet.) (evidence, including evidence that livestock show consistently mislead disqualified participants about its intentions to retest drug samples of animals making it impossible for participants to participate in or monitor tests, was sufficient to support finding of knowing violation). We resolve Brenntag's second issue against it.

### c. Economic Damages Finding

The jury was asked to find, as one element of Dal–Chrome's economic damages, the amount of the loss of the benefit of the bargain. Without objection, the jury was instructed that:

> Loss of the benefit of the bargain. "The difference, if any, in the value of the bumpers after chrome-plating involving the acid in question and the value of the bumpers had if the acid had been as represented. The difference, if any, shall be determined at the time and place the chrome-plating was attempted."

Brenntag did not object to the wording of this instruction at trial and does not chal-

lenge on appeal whether the instruction is a correct statement of the benefit-of-the-bargain measure of damages. Because Brenntag is not contesting the form of the benefit-of-the-bargain damage instruction, we review the sufficiency of the evidence in light of the jury charge given and express no opinion regarding the instruction. *See St. Joseph Hosp.,* 94 S.W.3d at 530 (discussing *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000)).

■ The jury found the benefit-of-the-bargain damages were $93,375.55; an amount equal to Dal–Chrome's evidence that it lost 461 bumpers at an average sales price of $202.55 each. In its third issue, Brenntag argues the evidence is insufficient to support the jury's finding. Brenntag contends the damage award is based on speculative claims of lost sales and on gross profits instead of net profits.

Brenntag's main argument is that Dal–Chrome's damage evidence was of gross profits rather then net profits and therefore insufficient. However, the jury was not asked to determine Dal–Chrome's profit, either gross or net, on the affected bumpers; it was only asked to determine the difference in the value of the bumpers if they had been chrome-plated using acid as represented and the value of the bumpers plated using the acid actually delivered. Thus the issue of whether it is proper to use gross or net profits in calculating damages never arose in this case.

A total of 461 bumpers were affected by the plating problems. The record contains evidence that Dal–Chrome could have sold properly plated bumpers for an average price of $202.55. Based on Dal–Chrome's price list at the time, Dal–Chrome's accountant selected 100 chrome bumpers ranging in price from $100 to $336 and calculated an average price of $202.55. In addition, the jury heard evidence that Dal–Chrome records in its records a loss of $70 per bumper for rejected bumpers and that Dal–Chrome offered to settle with Brenntag at one point for $25 per bumper.

The jury was not asked to consider whether Dal–Chrome lost sales as a result of the problems. However, there was evidence Dal–Chrome had a ready market for its bumpers during the time in question. Dal–Chrome was able to sell all its inventory about once a month. In June of 1998, Dal–Chrome had more demand than its available supply and it had to buy additional bumpers from other suppliers because of the 461 bumpers it could not use. This is some evidence of lost sales.

There was also evidence that the affected bumpers had little or no value. At the time of trial, the 461 bumpers were still in the yard at Dal–Chrome's facility. Brenntag introduced photographs showing the condition of the bumpers. Witnesses testified it was not cost-effective to strip the defective chrome-plating off of the damaged bumpers and then re-plate them. While Dal–Chrome's accountant stated it was possible the bumpers had some scrap value, the jury could reasonably conclude from the evidence, including testimony that the bumpers could not be repaired and the condition of the bumpers shown in the photographs, that the scrap value was nominal.

After reviewing the evidence in the record, we conclude the evidence is legally and factually sufficient to support the jury's finding. We resolve Brenntag's third issue against it.

**2. Economic Damages Plus Additional Damages**

■ The trial court awarded Dal–Chrome's net actual damages *plus* three times that amount based on the jury's award of additional damages for the knowing finding. TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) ("If the trier of fact finds that

the conduct of the defendant was committed knowingly ... the trier of fact may award not more than three times the amount of economic damages"). However, the DTPA permits a maximum award of three times the amount of economic damages for a knowing violation. *See Jim Walter Homes, Inc. v. Valencia,* 690 S.W.2d 239, 240–42 (Tex.1985) (interpreting prior version of DTPA). Brenntag's fourth issue argues the trial court erred in awarding quadruple damages for a knowing violation of the DTPA.

Dal–Chrome agrees that the trial court may not award both actual damages plus three times actual damages. We resolve Brenntag's fourth issue in its favor, and will modify to trial court's judgment to limit the DTPA award to three times the amount of economic damages found by the jury after considering the issue of offset as discussed below.

### 3. Dal–Chrome's Issues: Offset of Counterclaim and Brenntag's Attorneys' Fees

Dal–Chrome's first issue argues the trial court improperly offset the amount it owed on Brenntag's counterclaim from Dal–Chrome's actual damages before calculating the statutory limit on additional damages the trial court may award based on the jury's findings of additional damages and a knowing violation of the DTPA. *See* TEX. BUS. & COM.CODE ANN. § 17.50(b)(1). Dal–Chrome's second issue challenges the jury's finding of Brenntag's attorneys' fees because Brenntag did not segregate its fees for defending the DTPA claim from the fees for presenting its counterclaim. Brenntag argues that Dal–Chrome failed to preserve error on these issues because the record does not show it presented them to the trial court and obtained a ruling. *See* TEX.R.APP. P. 33.1(a).

To present a complaint for appellate review, the record must show: (a) the complaint was presented to the trial court by a timely request, objection, or motion stating the specific grounds for the desired ruling if the specific grounds are not apparent from the context; and (b) the trial court ruled on the request. TEX.R.APP. P. 33.1(a). To preserve a complaint of error in a judgment, a party must inform the trial court of its objection by a motion to amend or correct the judgment, a motion for new trial, or some other similar method. *Arthur's Garage, Inc. v. Racal–Chubb Sec. Sys., Inc.,* 997 S.W.2d 803, 816 (Tex. App.-Dallas 1999, no pet.).

### a. Offset of Damages Before or After Trebling

The record indicates Dal–Chrome did not file a motion for new trial or a motion to modify or correct the judgment following either the trial court's initial judgment or the modified judgment. Although Dal–Chrome filed a motion for judgment on the jury's verdict, this motion did not address the issue of an offset for Brenntag's counterclaim or the jury's finding of Brenntag's attorneys' fees for presenting the counterclaim. The record does not include any other post-judgment motions raising Dal–Chrome's arguments about offset.

Dal–Chrome argues these issues were presented to the trial court at the hearing on its motion for judgment on the verdict. We have no record of the hearing nor do we have a bill of exception regarding the hearing; and Dal–Chrome admits no record was made of that hearing. Dal–Chrome argues it presented the issues to the trial court in a proposed judgment it submitted at the hearing. This proposed judgment was not included in the original clerk's record. Dal–Chrome filed a letter requesting a supplemental clerk's record and attached a copy of the proposed judgment to its request. *See* TEX.R.APP. P. 34.5(c). The supplemental clerk's record,

however, contains only Dal–Chrome's request for a supplemental record with the proposed judgment attached to that request. This is the only copy of the proposed judgment in the supplemental record, and it is not file-stamped or marked received; there is nothing in the record to indicate it was presented to the trial court, or that any issues concerning the computation of the offset and limit on additional damages were argued to the trial court. *See Intermarque Auto. Prod., Inc. v. Feldman,* 21 S.W.3d 544, 554 (Tex.App.-Texarkana 2000, no pet.) (although rule 34.5 allows for supplementation of record, bankruptcy order was not admitted as evidence when trial court ruled and therefore record could not be supplemented); *Barker CATV Constr., Inc. v. Ampro, Inc.,* 989 S.W.2d 789, 795 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (rule 34.5(c) does not permit record in restricted appeal to be supplemented unless it is clear that item to be considered was before trial court when it rendered default judgment).

■ Once the trial court rendered a judgment on the verdict that Dal–Chrome was not entirely happy with, Dal–Chrome was required to present its complaints about the actual judgment rendered to the trial court and obtain a ruling. *See Arthur's Garage,* 997 S.W.2d at 816. We conclude the record before us does not show that Dal–Chrome presented its first issue to the trial court by a timely request, motion, or objection and obtained a ruling on the issue. Thus, the issue is not preserved for appeal. Tex.R.App. P. 33.1(a). We resolve Dal–Chrome's first issue against it.

**b. Brenntag's Attorneys' Fees**

■ Dal–Chrome's argument that Brenntag failed to segregate its attorneys' fees raises an issue as to the factual sufficiency of the evidence to support the jury's finding of the reasonable amount of Brenn-

tag's attorneys' fees for presenting its counterclaim. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 11–12 (Tex.1991) (concluding evidence of unsegregated attorneys' fees is some evidence of segregated fees). A factual sufficiency point in a jury trial must be preserved by a motion for new trial. Tex.R. Civ. P. 324(b); Tex. R.App. P. 33.1(a). Dal–Chrome did not file a motion for new trial challenging the factual sufficiency of the evidence to support the finding of Brenntag's attorneys' fees. Nor did Dal–Chrome file a motion to disregard the jury finding or for judgment notwithstanding the verdict regarding the finding of Brenntag's attorneys' fees.

■ Dal–Chrome did move for a directed verdict, arguing that Brenntag failed to segregate the fees for presenting the counterclaim from those for defending Dal–Chrome's claims. The trial court denied the motion for directed verdict. However, a motion for directed verdict is a motion challenging the legal sufficiency of the evidence on a particular issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000) ("A court may instruct a verdict if no evidence of probative force raises a fact issue on the material questions in the suit."). The motion is properly denied if there is more than a scintilla of evidence on the issue. *See Szczepanik v. First So. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam).

■ Dal–Chrome's motion was properly denied because, "[e]vidence of unsegregated attorney's fees is more than a scintilla of evidence of segregated attorney's fees, i.e. what a reasonable attorney's fee would be for the entire case indicates what the segregated amounts should be." *Stewart Title Guar.,* 822 S.W.2d at 12. Because a motion for directed verdict or judgment notwithstanding the verdict as-

serts the evidence is legally insufficient, it does not preserve a complaint on appeal that the evidence is factually insufficient. TEX.R.APP. P. 33.1(a) (objection must state specific grounds of complaint unless apparent from context); *see Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.*, 115 S.W.3d 191, 203 n. 5 (Tex.App.-Dallas 2003, pet. dism'd) (legal sufficiency issue preserved by motion for directed verdict, but factual sufficiency issue was not preserved where no motion for new trial was filed); *Kratz v. Exxon Corp.*, 890 S.W.2d 899, 902 (Tex.App.-El Paso 1994, no writ) (citing *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991)).

We conclude the record before us does not show that Dal–Chrome presented its second issue to the trial court by a timely request, motion, or objection and obtained a ruling on the issue. Thus, the issue is not preserved for appeal. TEX.R.APP. P. 33.1(a). We resolve Dal–Chrome's second issue against it.

### 4. Rate of Post–Judgment Interest

■■■■ Dal–Chrome's third issue complains that the trial court erred by reducing the post-judgment interest rate to five percent in the final modified judgment because the post-judgment interest rate was ten percent at the time the parties agreed that post-judgment interest would be calculated beginning May 27, 2003. This issue was argued on the record at the hearing on Brenntag's motion to modify the judgment. Dal–Chrome presented its arguments for a higher post-judgment inter-

est rate under the parties' agreement, but the trial court rejected these arguments when it modified the judgment. Thus, the issue is preserved for appeal. TEX.R.APP. P. 33.1(a).

■■■■ Dal–Chrome initially argues that Brenntag's motion to modify the judgment was not filed within 30 days of the original judgment and was not timely. *See* TEX.R. CIV. P. 329b(g). We agree the motion was not timely, however, Brenntag's motion for new trial was timely and extended the trial court's plenary power to "grant a new trial or to vacate, modify, correct, or reform the judgment" until 30 days after the motion for new trial was overruled. TEX.R. CIV. P. 329b(e). The modified judgment was signed within 30 days after the motion for new trial was overruled by operation of law. Even though Brenntag's motion to modify the judgment was not timely, the trial court retained plenary power over its judgment by reason of the timely motion for new trial. Thus the trial court had plenary power to modify the post-judgment interest rate at the time the modified judgment was signed.

At the time the trial court signed the original judgment on October 24, 2003, the statutory post-judgment interest rate was five percent. TEX. FIN.CODE ANN. § 304.003(a).[1] The October 24, 2003 judgment, however, awarded post-judgment interest at the rate of ten percent "beginning on May 27, 2003 per the agreement of the parties."[2] Brenntag's motion to modi-

---

1. Because the original judgment was signed after the effective dates of both of the bills amending section 304.003(c), we need not decide which effective date controls. *See Bic Pen Corp. v. Carter*, 171 S.W.3d 657, 677–80 (Tex.App.-Corpus Christi 2005, no pet. h.) (discussing different effective dates of bills amending section 304.003(c)); *City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 388–89 (Tex.App.-Dallas 2004, no pet.).

2. Because neither party argues otherwise, we assume without deciding that parties may stipulate that post-judgment interest begins to accrue on a date other than the date the judgment is rendered. *See* TEX. FIN.CODE ANN. § 304.005(a) ("Except as provided in Subsection (b), postjudgment interest on a money judgment of a court of this state accrues during the period beginning on the date the judg-

fy the judgment (although untimely) requested the trial court to modify the judgment to award post-judgment interest at the rate of five percent under section 304.003(a).

The letter agreement states that any post-judgment interest will be calculated beginning May 27, 2003 and that the agreement does not waive any right to appeal, "excluding the date on which post-judgment interest begins." Dal–Chrome admits no rate of interest is specified in the letter agreement, but argues the May 2003 post-judgment interest rate (ten percent) was an implied term of the agreement and thus post-judgment interest is governed by finance code section 304.002, which allows interest on judgments on contracts at the rate of interest specified in the agreement. Tex. Fin.Code Ann. § 304.002.[3] However, section 304.002 applies to a judgment on a contract that provides for interest and the rate is specified in the contract. *Id.* The judgment in

this case was for violations of the DTPA, and not on the letter agreement. Further, the letter agreement does not specify a rate of interest as required by section 304.002.

We conclude the trial court did not abuse its discretion in concluding the parties agreed only that post-judgment interest would be calculated beginning May 27, 2003 and did not agree to a specific rate of interest. Thus, the trial court did not err in modifying the judgment to award post-judgment interest at the rate specified by section 304.003(c). We resolve Dal–Chrome's third issue against it.

### Conclusion

Having resolved Brenntag's fourth issue in its favor, we must modify the trial court's judgment. We modify the trial court's judgment to award Dal–Chrome damages against Brenntag based on the following calculations:

| | | |
|---|---|---|
| 1. | Discretionary damages of not more than three times net economic damages after offsetting Brenntag's actual damages ($99,840.55–$19,893.61 = $79,946.94) | $239,840.82 |
| 2. | Dal–Chrome's pre-judgment interest | $ 21,910.01 |
| 3. | Dal–Chrome's attorneys' fees through judgment | $165,000.00 |
| | **Sub Total** | $426,740.83 |
| 4. | Offset by Brenntag's pre-judgment interest to 10/24/03 | ($ 4,256.74) |
| 5. | Offset by Brenntag's attorneys' fees through trial on its counterclaim | ($ 80,000.00) |
| | **Net Award to Dal–Chrome** | $342,494.09 |

In all other respects, the trial court's January 16, 2004 modified judgment is affirmed as modified.

---

ment is rendered and ending on the date the judgment is satisfied.").

**3.** A money judgment of a court of this state on a contract that provides for interest or time price differential earns postjudgment interest at a rate equal to the lesser of:

(1) the rate specified in the contract, which may be a variable rate; or

(2) 18 percent a year.