Ronald BANKS and Erica Banks, Individually and as Next Friends of Ronald Banks, Jr., a Minor, Appellants

v.

COLUMBIA HOSPITAL AT MEDICAL CITY DALLAS SUBSIDIARY, L.P. d/b/a Medical City Dallas Hospital, Appellee.

No. 05–05–00935–CV.

Court of Appeals of Texas, Dallas.

July 12, 2007.

Rehearing Overruled Oct. 10, 2007.

**66**

Lawrence L. Mealer, Dallas, for appellants.

David E. Olesky, Michelle E. Robberson, Cooper & Scully, P.C., Dallas, for appellee.

Before Justices MOSELEY, BRIDGES, and RICHTER.

## OPINION

Opinion by Justice BRIDGES.

Appellants Ronald and Erica Banks appeal from a take nothing judgment following a jury trial in their medical malpractice action. In four issues, the Bankses contend generally: (1) the evidence is factually insufficient to support the jury finding that the hospital was not negligent; (2) the trial court erred in including certain instructions in the jury charge; and (3) the trial court erred in allowing certain testimony. We overrule the Bankses' issues and affirm the trial court's judgment.

### Background

This is a medical malpractice action involving the birth of the Bankses' second child. Erica Banks was admitted to Medical City Dallas Hospital on January 23, 2002 at 11:00 p.m. Her obstetrician, Dr. Embry Williams, arrived at the hospital and checked on Erica around 1:30 a.m. At 7:00 a.m., nurse Caryl Hines came on duty and took over for the night nurse. Around 7:15 a.m., Hines said Erica was fully dilated and instructed her to start pushing. After pushing for well over an hour, Hines

instructed Erica not to push and Hines called for Dr. Williams. Erica said a second nurse came into the room. Dr. Williams arrived at approximately 9:10 a.m.

Dr. Williams soon suspected shoulder dystocia, a condition where the baby's shoulder is stuck under the mother's pubic bone. His first attempt to release the shoulder with the McRoberts maneuver failed. He then discovered that the umbilical cord was tightly wrapped twice around the baby's neck. He cut the cord. This procedure cut off the baby's supply of oxygen and nutrients. The baby still did not deliver because of the shoulder dystocia. Dr. Williams then attempted the corkscrew maneuver where he turned the baby in an attempt to release the shoulder. The baby's shoulder released and the baby was delivered at 9:21 a.m. As will be discussed later in the opinion, the jury heard conflicting testimony as to the nurses' action while Dr. Williams tried to release the baby's shoulder.

Because of the loss of oxygen, the baby had to be resuscitated. The baby suffered severe neurological injuries.

The Bankses filed this lawsuit seeking to hold the hospital liable for negligence, through the actions of its nurses in applying fundal pressure with shoulder dystocia. They asserted that the nurses' actions delayed the delivery of the baby and, thus, prolonged the time that the baby was without oxygen. The case was tried to a jury. The jury heard conflicting testimony as to who applied fundal pressure and when it was applied. The jury answered "no" to the following question: "Did the negligence, if any, of Medical City Dallas Hospital, acting through its nurses, proximately cause the occurrence or injury in question?" This appeal timely followed.

## Sufficiency of the Evidence

In their first issue, the Bankses contend the evidence is factually insufficient to support the jury finding on the above question. To establish negligence in a medical malpractice case, the plaintiff must establish that the negligent act or omission of the hospital, either directly or acting through its nurses, proximately caused the harm. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993). The Bankses state in their brief that the only allegation of negligence pertinent to this appeal is the nurses' application of fundal pressure.

When conducting a factual sufficiency review, we must consider all of the evidence, including any evidence contrary to the verdict. *Plas–Tex., Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). Furthermore, we must reverse on the basis of factual insufficiency if the court's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). When a party challenges the factual sufficiency of the evidence supporting an adverse finding on which it bore the burden of proof, it must demonstrate the adverse finding is against the great weight and preponderance of the evidence. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). Only if we determine, after considering all the evidence, the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust will we set aside the verdict for factual insufficiency. *Id.*

The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). Moreover, it is within the province of the jury to weigh opinion evidence and the judgment of experts. *Pilk-*

*ington v. Kornell,* 822 S.W.2d 223, 230 (Tex.App.-Dallas 1991, writ denied). It is the jury's role to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. *Dal–Chrome Co. v. Brenntag Southwest, Inc.,* 183 S.W.3d 133, 141 (Tex.App.-Dallas 2006, no pet.).

The jury heard conflicting testimony as to who applied fundal pressure and when it was applied. Erica testified that at approximately 7:15 a.m., Hines told her she was fully dilated and instructed her to start pushing. After pushing for well over an hour, Hines instructed Erica to stop pushing and Hines called for Dr. Williams. Erica said a second nurse came into the room. Dr. Williams arrived at approximately 9:10 a.m.

Erica testified that Dr. Williams soon discovered that the umbilical cord was wrapped twice around the baby's neck. He cut the cord. The baby still did not deliver because of the shoulder dystocia. Erica testified that after the doctor cut the umbilical cord, two nurses pushed her knees toward her head. At the same time, Erica testified, two other nurses were on the table where she was lying and pushed with their hands right underneath her breasts. This type of pressure is known as fundal pressure. Erica testified that she did not recall the nurses applying suprapubic pressure below the stomach. She admitted that the nurses may have applied suprapubic pressure and that she simply did not remember it. She said that it seemed like the nurses pushed for about five minutes with each contraction.

Dr. Williams testified that the baby's head delivered and then retracted. At that point, he thought was dealing with shoulder dystocia. In an attempt to free the shoulder, he told the nurses to do the McRoberts maneuver where they push the mother's legs toward her head and apply suprapubic pressure below the stomach. In his attempt to free the shoulder, Dr. Williams discovered the double nuchal cord, meaning the umbilical cord was wrapped twice around the baby's neck. The umbilical cord supplies both oxygen and nutrients to the baby. In an effort to deliver the baby, he cut the cord. The baby still did not deliver because of the shoulder dystocia. Dr. Williams performed the corkscrew maneuver and attempted to turn the baby. The shoulder released and the baby delivered.

Dr. Williams testified that it was a distinct possibility that the double nuchal cord deprived the baby of oxygen. He testified that the nuchal cord caused more fetal distress than the shoulder dystocia. He also testified that he did not see the nurses apply fundal pressure and would not have ordered them to do so. Dr. Williams testified that the baby's injuries were not caused by any negligence of the nurses.

Dr. Lynna Littleton testified that she has a doctorate degree in nursing. She is a professor at the University of Texas Health Science Center School of Nursing in Houston. She said that a nurse should not apply fundal pressure without a doctor's order. She testified that applying fundal pressure while the shoulder is impacted would serve only to further impact the shoulder, not release it. Dr. Littleton testified on cross-examination that a mother might not be able to distinguish between fundal pressure applied below the breasts from suprapubic pressure applied below the stomach.

Dr. Betty Edwards, an obstetrician/gynecologist, testified as an expert witness for the Bankses. At the time of trial, Dr. Edwards had been practicing for over twenty years and had encountered shoulder dystocia two to three times a year. She testified that fundal pressure is con-

traindicated with shoulder dystocia. In her opinion, nurses Hines and McNally were negligent in applying fundal pressure. In her opinion, the baby was still viable at 9:10 a.m. when Dr. Williams arrived.

On cross-examination, Dr. Edwards stated that a cesarean section is the only way to avoid shoulder dystocia. In her opinion, Dr. Williams breached the standard of care by not offering Erica a cesarean section. As to the application of fundal pressure, she stated that she did not think it would be helpful even after the shoulder is released. She did testify, however, that the use of fundal pressure is appropriate if it is applied *after* the shoulder is released and the baby is delivered without injury. At her deposition, however, she testified that she did not know whether fundal pressure would be helpful in that circumstance. Dr. Edwards testified that, if there had not been shoulder dystocia, in all reasonable medical probability, the baby would have been born without defects.

Caryl Hines testified that she was the nurse who took over Erica's care at 7:00 a.m. She testified that she made notes regarding the delivery about two hours after the event. In her notes she wrote that Erica was "instructed to push with fundal and suprapubic pressure given by Angie McNally and myself." Hines testified that this notation in the chart was a mistake. McNally was the only nurse who applied fundal pressure and it was applied only one minute prior to delivery.

Angela McNally, a nurse, assisted with the delivery of the Banks baby. She testified that she applied fundal pressure only after she saw that the baby's shoulder had been released. McNally applied fundal pressure at the very end of the delivery. McNally also testified that Dr. William's efforts released the baby's shoulder.

Deborah Vinson, a nurse, testified that she also assisted with the delivery of the Banks baby. She confirmed McNally's testimony that fundal pressure was applied only after the shoulder had been released and just before the baby was fully delivered.

Ronald Chauncey Banks, Sr., Erica's husband, testified that he was present during the delivery. He said at 8:55 a.m., the nurse told Erica not to push anymore and called Dr. Williams. Several minutes later, Dr. Williams arrived. Ronald said that two nurses held Erica's legs up and two other nurses were pushing on her stomach in a downward direction. He did not see the nurses push on an area below Erica's stomach. He admitted, however, that it was possible that it could have happened. Ronald testified that he believed Dr. Williams was negligent in his care.

As to the application of fundal pressure, the jury heard conflicting testimony. In their brief, the Bankses state, "there was no expert testimony to rebut Dr. Edwards' opinion that *if* Caryl Hines and Angela McNally utilized fundal pressure as Erica had testified, the effect would have been to delay delivery of the child." Dr. Edwards also testified, however, that use of fundal pressure is appropriate if it is applied *after* the shoulder is released and the baby is delivered without injury. Dr. Littleton agreed that it is appropriate to apply fundal pressure to help deliver the baby *after* the shoulder is released. The evidence is conflicting on when and by whom fundal pressure was applied. Erica said fundal pressure was applied by two nurses for about five minutes. Dr. Williams testified that he did not see the nurses apply fundal pressure. Although Hines's notes reflect that McNally applied fundal pressure around 9:13 and the baby was not delivered until 9:21, she testified that this nota-

tion was a mistake. She said McNally applied fundal pressure only after the shoulder was released and at about one minute prior to delivery. Nurses McNally and Vinson testified similarly.

The jury heard conflicting evidence as to the alleged negligence of the nurses in the use of fundal pressure and as to whether the baby's injuries were caused by fundal pressure or the double nuchal cord. The jury was free to believe one witness, disbelieve another, and resolve inconsistencies in the testimony. *See Dal–Chrome Co.*, 183 S.W.3d at 141. Considering all of the evidence, we conclude the jury's finding on the issue is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we overrule the Bankses' first issue.

## Jury Charge

In their second and third issues, the Bankses contend the trial court erred in its submission of the case to the jury. Specifically, they contend the jury charge erroneously included inferential rebuttal instructions of unavoidable accident and new and independent cause. The Bankses objected to the inclusion of these two instructions on the ground that the evidence was legally and factually insufficient to support their submission. On appeal, the Bankses also argue that the trial court erred in: (1) submitting a broad-form question; (2) commingling a valid instruction with an invalid instruction; and (3) submitting more than one inferential rebuttal question. The Bankses did not object to the charge on these three additional grounds now asserted on appeal. Accordingly, these grounds are waived. *See* Tex.R. Civ. P. 274; Tex.R.App. P. 33.1(a)(1); *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003).

We review claims of charge error for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). A trial court does not abuse its discretion in submitting an instruction if there is any support in the evidence for it. *Louisiana–Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998).

The purpose of inferential rebuttal instructions like unavoidable accident and new and independent cause instructions is to inform the jurors that they do not have to place blame on a party if the evidence shows that conditions beyond the party's control caused the injury in question or that the conduct of some nonparty caused it. *Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429, 432 (Tex.2005). An unavoidable accident instruction is proper only when there is evidence that the event was proximately caused by a condition or circumstance beyond the control of any party. *Hill v. Winn Dixie Texas, Inc.*, 849 S.W.2d 802, 803 (Tex.1992).

A new and independent cause is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause. *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450–51 (Tex.2006). An intervening cause thus supersedes the defendant's negligence by destroying the causal connection between that negligence and the plaintiff's injury thereby relieving that defendant of liability. *Id.* If an intervening cause was reasonably foreseeable by the defendant in the exercise of ordinary care, it cannot be considered a new and independent cause. *Dew*, 208 S.W.3d at 451. On the other hand, if the intervening cause is not foreseeable it may well be a superseding cause. *Id.*

The evidence in this case revealed that the baby's delivery was hampered by two obstetrical emergencies: (1) double nuchal

cord around the baby's neck; and (2) shoulder dystocia. Dr. Williams testified that it was distinctly possible that the baby was completely deprived of oxygen prior to the delivery of his head because of the double nuchal cord. He stated that the nuchal cord was the primary cause of the fetal distress. Both Dr. Williams and the nurses testified that the double nuchal cord was not foreseeable.

As to the shoulder dystocia, Dr. Littleton testified that a baby may suffer devastating injuries despite best efforts of the health care providers. Dr. Edwards testified that the combination of double nuchal cord and shoulder dystocia may delay delivery by six to eight minutes.

The alleged negligence of the hospital was the application by the nurses of fundal pressure after learning of the shoulder dystocia. As noted earlier, the evidence as to when fundal pressure was applied was conflicting. The jury heard evidence that McNally applied fundal pressure only after the baby's shoulder was released and right before delivery. Under these circumstances, the application of the fundal pressure would not have caused the delay in delivery. Rather, the cause of the delay would have been the two obstetrical emergencies. Accordingly, the trial court did not err in submitting the unavoidable accident instruction. See Louisiana–Pacific Corp., 976 S.W.2d at 676.

Dr. Williams and the nurses testified that the double nuchal cord was unpredictable. Dr. Williams testified that he first suspected shoulder dystocia and at that point the nurses did the McRoberts maneuver and pushed Erica's legs back and applied suprapubic pressure. Erica presented conflicting testimony stating that the nurses applied fundal pressure when her legs were pushed back. Erica also testified that the nurses pushed her legs back and applied fundal pressure after Dr.

Williams cut the cord. When the baby still did not deliver, Dr. Williams discovered the double nuchal cord. Dr. Williams cut the cord. Cutting the cord completely cut off the baby's oxygen supply. The primary cause of the baby's injury was oxygen deprivation. Assuming, the nurses applied fundal pressure while holding Erica's legs in the McRoberts position as testified to by Erica and that act delayed the delivery, Dr. Williams's subsequent act of cutting the umbilical cord was a new and independent cause of the oxygen deprivation. There is evidence to support the new and independent cause instruction. Accordingly, the trial court did not abuse its discretion in submitting it. We overrule the Bankses' second and third issues.

### Testimony as to Dr. Williams's Negligence

██ In their fourth issue, the Bankses contend the trial court erred in allowing defense counsel to elicit testimony from Dr. Edwards and Ronald Banks as to the negligence of Dr. Williams.

██ We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex.2001). To reverse a judgment based on a claimed error in admitting evidence, a party must show that the error probably resulted in an improper judgment. *Id.*; TEX.R.APP. P. 61.1(a). A party waives any complaint regarding a ruling on the admissibility of evidence when testimony to the same effect has been admitted without objection. *Ramirez v. H.E. Butt Grocery Co.*, 909 S.W.2d 62, 69 (Tex.App.-Waco 1995, writ denied).

Dr. Edwards testified, without objection, that in this case the only way to have delivered the baby without injuries was for Dr. Williams to have performed a C–Sec-

tion.[1] Counsel for the Bankses later objected when defense counsel asked Dr. Edwards whether she was familiar with the standard of care for an obstetrician on the ground that Dr. Williams's conduct had no relevance to the case. Because Dr. Edwards testified without objection that the only way Dr. Williams could have avoided the shoulder dystocia was by performing a C-section, we conclude the Bankses have waived their issue with respect to this testimony.

With respect to the testimony of Ronald Banks, he opined that Dr. Williams was negligent in his care. Even assuming it was error to admit this testimony, we conclude such error was harmless. The Bankses have failed to show that this testimony from Ronald Banks probably resulted in the rendition of an improper judgment. *Interstate Northborough P'ship*, 66 S.W.3d at 220; Tex.R.App. P. 61.1(a).

We conclude the trial court did not err in admitting the complained-of testimony. Accordingly, we overrule the Bankses' fourth issue.

We affirm the trial court's judgment.

---

1. On cross-examination, Dr. Edwards testified, without objection, as follows:

   Q. We can agree, can we not, that in this case the only way to have avoided the shoulder dystocia was to have done a C-section, right?

   A. Yes, sir.

   Q. And we can also agree that in this case the only way to have prevented the baby's injuries from this delivery with certainty, was to have a C-section, right?

   