**Opinion issued December 28, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-00715-CV

————————————

**RYLAND ENTERPRISE, INC., Appellant**

**V.**

**VICKIE WEATHERSPOON, Appellee**

On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 0740425

## MEMORANDUM OPINION

Appellee, Vickie Weatherspoon, sued appellant, Ryland Enterprise, Inc.

("Ryland"), seeking recovery of compensation that she alleged Ryland owed her

for work performed on Ryland's behalf on a project with a third party, Marathon

Oil Company ("Marathon Oil"). A jury found in favor of Weatherspoon, and the trial court rendered judgment accordingly. Ryland now appeals, arguing in three issues that: (1) the evidence does not support the jury's answers; (2) the trial court erred in allowing Weatherspoon to present evidence of Ryland's budget for the Marathon Oil project and her invoice reflecting the work she performed; and (3) the trial court erred in ruling that Weatherspoon's rescission by letter of a prior contract between herself and Ryland resulted in a new agreement.

We affirm.

## Background

In January 2006, Ryland, acting through its president, Ed Ryland, Jr., and Weatherspoon entered into a "Memorandum of Understanding" ("MOU") defining the relationship between them. The MOU provided that Weatherspoon, who had previous experience as a property manager, joined Ryland "as an Independent Contractor to assist with business development and assignment execution." The MOU stated that the parties' "primary focus will be to promote commercial real estate services" to government organizations, businesses, and individuals. The MOU further provided that "[a]ll personal business related expenses (communications, travels and other related expenses) incurred by [Weatherspoon] to generate and secure business shall be the responsibility of [Weatherspoon]," and

2

reimbursement for other expenses should be discussed in advance on a case-by-case basis.

Regarding compensation, the MOU provided:

4. Upon generating revenues and after addressing business operating expenses if applicable. [sic] The balance of the incomes shall be applied as follows:

a. Vickie secure business Ed provides technical skills and execution (Hand-Off) 25% of fees earned go to Vickie

b. Vickie secure business Ed assigns to in-house agent and over see assignment 20% of fees earned go to Vickie subject to agreement from in-house agent. (Hand-Off)

c. Vickie secure business require partnering (C&W, Concordis, other) Minimum of 15% of fees paid to Ryland Enterprise go to Vickie. (*This is a case by case potential*).

d. Vickie secure business, Vickie provides technical skills and execution, Ed oversee assignment 40% of fees earned to Vickie (Cradle to Grave)

e. Leasing and sales where Vickie is the procuring cause and servicing associate 50% of fees earned to Vickie.

5. In the event this Memorandum of Understanding is terminated revenue will continue to be due to [Weatherspoon] from any further business concluded between Ryland Enterprise, Inc. DBA ConcordisRyland and the business entities and transactions brought in and introduced by [Weatherspoon].

Weatherspoon and Ryland also agreed to written "Business Relationship Guidelines." This document provided that Weatherspoon had "a strong real estate background regarding property management and general business practice" and

3

that her "initial role with ConcordisRyland [a d/b/a of Ryland Enterprise, Inc.] will be to assist with business development." It further provided that her compensation "will be tied to business development results and fees generate[d] from new business." It also outlined preferences for communication, Ryland's core values, and specifics about performance reviews and measurement of progress in the business relationship.

Weatherspoon, who had previously been a licensed real estate agent in California, earned her real estate license in Texas and listed Ed Ryland as her sponsoring broker.

At the time Ryland and Weatherspoon entered into the MOU, Ryland had been seeking a contractual relationship with Marathon Oil and was dealing with Michael Smith, a manager for Marathon Oil. Marathon Oil decided to enter into a business arrangement with Ryland for relocation and construction project management services. Weatherspoon was part of the team of people at Ryland who created a proposal for the Marathon Oil contract.

Before Marathon Oil accepted the proposal, and before Marathon Oil and Ryland executed their agreement, Weatherspoon decided to seek other employment as a substitute teacher. On August 29, 2006, Weatherspoon delivered to Ed Ryland a letter informing him of her intention to teach, which stated that,

4

beginning September 1, 2006, she would no longer be available to work for Ryland on a full-time basis. The letter stated:

> Please review our Memorandum of Understanding and Business Relationship Guidelines for modification. Per our discussion, I would like to develop possibilities to work on other assignments with you such as commercial real estate referrals and back office administrative work. My billable hourly rate for administrative work will be $50.00 per hour. Administrative projects would include such activities as developing and packaging RFPs, researching and mapping prospective properties for sell and/or lease, setting up files and project activities for construction and property management assignments. I can offer 10-15 hours per week for these assignments.
>
> . . . .
>
> Listed below are the projects I have been involved with during the past eight (8) months. I would like to discuss what commissions I will earn when these deals book and fund. Also, I would like to discuss the transition plan to assign these projects on to others for completion as well as what, if any, role I can still play to fulfill the contracts.

The Marathon Oil contract was listed among the pending deals, along with several other matters.

However, Ed Ryland informed Weatherspoon that Marathon Oil had already accepted the proposal, and he offered her the opportunity to remain employed with Ryland. Weatherspoon agreed to continue working for Ryland, and she did not take the teaching job. Ryland presented her with a new "Consulting Agreement," which contained a provision that, during its term, Ryland would pay Weatherspoon $2,500 per month as "Representative Compensation." In return, Weatherspoon was to provide Ryland with the "consulting services" described in the Consulting

5

Agreement. The Consulting Agreement described Weatherspoon and Ryland as having an "Independent Contracting Relationship." However, this agreement was never signed.

After the Marathon Oil contract took effect in December 2006, Ryland began paying Weatherspoon $2,500 per month. Weatherspoon informed Ed Ryland that she had never agreed to receive $2,500 per month for her work on the Marathon Oil contract and that she believed she was entitled to 50% of the revenues received under the Marathon Oil contract, as provided in the MOU. However, Ryland continued to pay Weatherspoon $2,500 per month for her services, and Weatherspoon accepted the payment. Weatherspoon retained an attorney to pursue the compensation she believed she was owed for the Marathon Oil contract. Ryland disputed that she was entitled to 50% of the fees and continued to pay her $2,500 per month. She received checks for that amount from December 2006 through April 2007.

Ryland also asked Weatherspoon to refrain from contacting anyone at Marathon Oil regarding the dispute over her payment, and she agreed. However, Weatherspoon later contacted Smith at Marathon Oil regarding the dispute and requested a meeting. Upon learning of this contact between Weatherspoon and Smith, Ryland dismissed Weatherspoon.

Weatherspoon filed suit on July 2, 2007, seeking the compensation due to her under the Marathon Oil contract.

On June 9, 2009, the trial court heard Ryland's motion for summary judgment and found that Weatherspoon was not a "procuring cause and servicing associate" for the Marathon Oil contract. Thus, she was not entitled to 50% of the fees provided for in the MOU. Weatherspoon subsequently amended her petition to add a cause of action for unjust enrichment.

On October 12, 2009, Ryland moved for summary judgment on Weatherspoon's unjust enrichment and breach of contract claims. The trial court granted this motion in part, concluding, as urged by Ryland, that the August 29, 2006 letter rescinded the written MOU. The trial court ordered that Weatherspoon could proceed to trial on her "claim for unjust enrichment/quantum meruit" and dismissed with prejudice "all other causes of action."

At the trial on the quantum meruit claim, Weatherspoon testified that she moved to Texas in 2004 and worked in the real estate business. She obtained a real estate license, but it remained inactive because she needed a sponsoring agent. Eventually, Weatherspoon learned of a prospective business opportunity to provide property-management services to a university, so, through a mutual acquaintance, she met with Ed Ryland and proposed that they work together to take advantage of this opportunity. He became her sponsoring agent for purposes of obtaining her

real estate license, and she began working with him in developing several different property-management opportunities, including working with a team to develop the proposal for Marathon Oil.

Weatherspoon testified that, after she told Ed Ryland she was going to work for Pasadena Independent School District and gave him the August 29, 2006 letter stating that she would continue to work on an hourly basis for a rate of $50 per hour, he asked her to stay with Ryland to work on the Marathon Oil contract. She stated that Ed Ryland never expressly refused to pay her $50 per hour, but she also believed that the terms of the MOU were still in effect. Weatherspoon testified that she agreed to stay and work on the Marathon Oil contract, in addition to several other projects, and that when the Marathon Oil contract started on December 1, 2006, Ryland began paying her $2,500 per month. However, she testified that she had not agreed to that amount, so she made a claim against Ryland. She testified that after she sent the demand letter, Ryland locked her out of the office by changing the locks and confiscated all of her personal belongings. Ed Ryland continued to contact her via e-mail for updates regarding the Marathon Oil project, which she responded to via e-mail.

Weatherspoon testified that, following the trial court's ruling that the MOU was rescinded by her August 29, 2006 letter, she provided an invoice to Ryland in December 2009 identifying the work she performed from September 1, 2006 to

March 31, 2007. Ryland objected to the admission of this document, specifically challenging its authenticity. However, Ryland had previously offered a copy of the invoice as its own Exhibit 6, which the trial court had admitted prior to opening statements. The trial court overruled Ryland's objection and admitted the document again, informing Ryland that it "could take [Weatherspoon] on cross." The invoice described 1,247 hours of work done in the areas of "administration, advertising, clerical, consulting, marketing, [and] new business development." Furthermore, it reflected a $12,500 credit for the payments that Ryland had already made for December 2006 through April 2007.

On cross examination, Weatherspoon testified that she created the invoice using her memory, calendar, meeting minutes, agendas, and documents from her computer and other files. Weatherspoon agreed that earlier in the litigation she had stated that she had spent 960 hours working on various projects for Ryland, rather than the 1,247 claimed in the invoice. Weatherspoon testified that she arrived at the 960-hour estimation before she went through all of her notes and other documentation. Ryland then impeached Weatherspoon with the testimony from her deposition, in which she testified that she had done 960 hours of work for Ryland prior to the Marathon Oil contract's going into effect. Weatherspoon testified that "[t]hat's not the same 960 hours in there." She testified that the invoice she gave to Ryland reflecting 960 hours of work related only to the

Marathon Oil contract and did not contain any hours she had spent working on other matters. The 960-hour invoice was for a different time period—January 2006 through November 2006. She testified that she created the 960-hour invoice prior to the trial court's ruling that the operative time period for her quantum meruit claim was from August 29, 2006—the date of her letter—until she left Ryland permanently.

Ryland's counsel asked Weatherspoon whether Ed Ryland agreed to her August 29, 2006 letter, and she replied that he did. She stated that "[h]e told [her] he wanted [her] to continue working, and [she] did," although he did not specifically agree to pay her $50 an hour. She testified that "all things that [she] put in [her] invoice [were] administrative work." When Ryland asked whether she performed any of the items listed in the invoice as a real estate agent, she answered, "Yes, I did."

Weatherspoon further testified that she worked primarily in the area of property management for Ryland and that people in Harris County doing work similar to the work she completed for Ryland earned between $50 and $150 per hour. She testified that she was a real estate agent the entire time she worked for Ryland but that not all of the work reflected in her invoice was the kind of work real estate agents do. She stated that the other, non-real estate agent work included "being a marketing executive, being public relations for a company, to represent a

10

company, in business forms, to do training meetings in front of different prospective clients." She also testified that she did other administrative work, such as developing the budget for the Marathon Oil contract, that was not "really real estate," although she agreed that some administrative work was incidental to her work as a real estate agent.

Finally, Weatherspoon also offered a copy of the Marathon Oil project budget created by her in conjunction with the proposal. When this document was initially offered, Ryland objected, arguing that it was irrelevant and "outside the parameters of the lawsuit" and that it would "add[] nothing other than to prejudice the jury and inform the jury of resources that Ryland Enterprises may have and that certainly would be prejudicial to the defense." The trial court sustained this objection.

Christina Stone, Weatherspoon's attorney, testified regarding her reasonable and necessary attorney's fees, which she asserted were $34,828.75 based on her billing rate and the number of hours worked.

Ed Ryland testified on behalf of Ryland. He testified that a friend asked him to mentor Weatherspoon, so he offered her an opportunity to join his company. He would then "provide her with mentoring as related to the commercial real estate industry." He testified that after he received the August 29, 2006 letter, Weatherspoon's "involvement with Ryland Enterprise almost came to a halt in

terms of the change that she did. She'd do maybe some follow-up [phone calls or e-mails, but] based on the letter, we did indeed transition those assignments over to other agents in our office." He stated that he never asked Weatherspoon to perform any administrative work after receiving her letter of August 29, 2006, that he never discussed the $50 hourly rate with her, and that he had never paid a real estate agent an hourly rate for administrative work. He testified that the only compensation provided to Weatherspoon after August 29, 2006 was "that we continued to pay the $2,500 a month for the Marathon account." He testified that Weatherspoon accepted and cashed those checks. Finally, he stated that he never considered or agreed to compensate Weatherspoon in any manner outside the MOU.

Ed Ryland further testified that he had twenty-seven years of real estate experience and that real estate agents, including each one in his entire organization, routinely "perform a number of tasks that are considered administrative tasks as part of the process of closing a deal." However, he also testified that people who work as property managers are not always paid a percentage of the fees. He also stated that he did not hire Weatherspoon as a property manager, although, at her suggestion, her title while working for Ryland was Manager of Property Management.

Ed Ryland testified that Weatherspoon continued to perform work related to the Marathon Oil contract after August 29, 2006 and that she was paid $2,500 a month. He testified that they agreed to $2,500 per month as Weatherspoon's compensation for work performed on the Marathon Oil contract because "that was the amount that [Weatherspoon] herself put in the budget from the very—as the budget was developed. So that was an amount that was agreed upon and that she was responsible for—was involved in preparing."

Weatherspoon again offered the Marathon Oil project budget, and Ryland again objected, stating, "Same objection as we raised before, outside the parameters." The trial court admitted the document. Ed Ryland agreed that the budget provided that Ryland's management fee was $10,000 per month. He testified that the $2,500 amount that Weatherspoon allegedly agreed to was not listed as a line-item in the budget; rather, the "lump sum" of $10,000 a month "includes the entire operations for us to manage that service per month" and "it includes administrative fee, our managers' fee as well."

The case was then submitted to the jury. Jury question one asked, "Did Vickie Weatherspoon at all times while working with [Ryland], operate as a real estate agent, and was all of her work incidental to her work as a real estate agent?"

The jury answered, "No."[1]   In response to question two, the jury found that Weatherspoon performed compensable work for Ryland.  Question two specified that "[o]ne party performs 'compensable work' if valuable services are rendered or materials furnished for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the work.  The relevant time period in this matter is August 29, 2006 through April 30, 2007."[2]   In response to question three, the jury found that $40,000 was "the reasonable value of such compensable work at the time and place it was performed."   Finally, the jury determined that Weatherspoon's reasonable and necessary attorney's fees were $34,828.

Ryland then moved for judgment notwithstanding the verdict ("JNOV"), arguing that the evidence clearly established that Weatherspoon was working as a real estate agent the entire time she was employed at Ryland.  It also complained about Weatherspoon's submission of evidence related to her expenses.  Finally, the motion for JNOV argued that quantum meruit is not available as a cause of action

---

[1]   During the charge conference, Weatherspoon objected to question one in its entirety, arguing that the question was not supported by the law or the facts and that "the fact whether or not Vickie Weatherspoon was acting as a real estate agent has no relevance in this cause of action."

[2]   The only objection to the jury charge that Ryland raised at trial was an objection to the time frame provided in question two.  Ryland argued that the time frame ought to end in December 2006, but the trial court overruled the objection.

14

to a real estate agent. The trial court denied the motion for JNOV and rendered judgment on the jury verdict. This appeal followed.[3]

## Sufficiency of the Evidence

In its first issue, Ryland argues that "[t]he evidence does not support the jury's answers to questions about [Weatherspoon] at all times during her tenure performing the duties of a real estate agent, [Ryland] obtaining a contract through undue advantage, the amount of money unjustly received through the taking of undue advantage and what the reasonable value of those services would be to a similar broker." Ryland also argues that Weatherspoon "may not recover under the theory of quantum meruit for work performed as a real estate agent. . . ." Finally, Ryland argues that we should disregard Weatherspoon's testimony as a matter of law because it was inconsistent.

We observe that the jury was not asked to make any findings regarding whether Ryland "obtained a contract through undue advantage" or its "taking undue advantage" of any person. Thus, we construe this issue as a challenge to the

---

[3]     Weatherspoon initially moved to dismiss the appeal, arguing that Ryland's notice of appeal, filed sixty-five days after the date of the final judgment, was untimely. This Court dismissed the appeal on jurisdictional grounds. *See Ryland Enter., Inc. v. Weatherspoon*, 355 S.W.3d 667, 668 (Tex. App.—Houston [1st Dist.] 2011), *rev'd* 355 S.W.3d 664 (Tex. 2011). The Texas Supreme Court subsequently reversed that dismissal, holding that the filing of a motion for new trial or a motion to modify the judgment, either before the judgment is signed or within thirty days after, extends the deadline for filing a notice of appeal to ninety days. It remanded the case for consideration of the merits of the appeal. *Ryland Enter., Inc. v. Weatherspoon*, 355 S.W.3d 664, 666–67 (Tex. 2011).

15

sufficiency of the evidence supporting the findings that were made by the jury. In response to the question of whether Weatherspoon operated as a real estate agent at all times while working for Ryland and whether all of her work was incidental to her work as a real estate agent, the jury answered "No." It found that she performed compensable work for Ryland between August 29, 2006 and April 30, 2007 and that the reasonable value for that work was $40,000.

## A.    Standard of Review

In conducting a legal sufficiency review, we credit favorable evidence if a reasonable juror could and disregard contrary evidence unless a reasonable juror could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. We sustain a no-evidence contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

In reviewing a challenge to the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and

16

unjust.  *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). Likewise, when a party challenges the factual sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, we should set aside the finding only if the evidence supporting it is so weak as to be clearly wrong and manifestly unjust.  *Cain*, 709 S.W.2d at 176.

Whether reviewing the evidence for legal or for factual sufficiency, we assume that jurors decided questions of credibility or conflicting evidence in favor of the finding if they reasonably could do so.  *City of Keller*, 168 S.W.3d at 819. We do not substitute our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement.  *Id.* at 822.  "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another.  Reviewing courts cannot impose their own opinions to the contrary."  *Id.* at 819.

## B.    Jury Question One and the Availability of Quantum Meruit to Weatherspoon

In the first part of its first issue, Ryland argues that the jury's finding in question one—that Weatherspoon did not operate as a real estate agent at all times while working for Ryland and that not all of her work was incidental to her work as a real estate agent—was not supported by the evidence.  Ryland argues that, as a real estate agent, Weatherspoon is not entitled to recover commissions under a

theory of quantum meruit as a matter of law. It relies on section 1101.806 of the

Real Estate License Act ("RELA"), found in the Texas Occupations Code.[4]

Occupations Code section 1101.806 addresses "Liability for Payment of

Compensation or Commission." It provides:

(a) This section does not:

> (1) apply to an agreement to share compensation among license holders; or

> (2) limit a cause of action among brokers for interference with business relationships.

(b) A person may not maintain an action to collect compensation for an act as a broker or salesperson that is performed in this state unless the person alleges and proves that the person was:

> (1) a license holder at the time the act was commenced; or

---

[4]       The version of the Real Estate License Act that Ryland actually cites was repealed effective in 2003 and is now codified in the Texas Occupations Code. *See* former Texas Revised Civil Statute article 6573a, *repealed by* Act of Apr. 26, 2001, 77th Leg. R.S., ch. 1421, §§ 13(a), 15, 2001 Tex. Gen. Laws 4570, 5020 (repealing article 6573a, among others and providing, "This Act takes effect June 1, 2003"); *see also* TEX. OCC. CODE ANN. §§ 1101.001–.806 (Vernon 2012). For example, Ryland cites Revised Civil Statute article 6573a, section 20(b), the repealed statute of frauds provision that is currently found in Occupations Code section 1101.806(c). Thus, we examine the current authority for Ryland's argument.

      Ryland also cites section of the current statute that Ryland cites is Occupations Code section 1101.559, which provides circumstances under which a broker may act as an intermediary, i.e., when a broker "is employed to negotiate a transaction between the parties to a transaction and for that purpose may act as an agent of the parties." *See* TEX. OCC. CODE ANN. §§ 1101.551(1), 1101.559 (defining "intermediary" and providing regulations for broker acting as intermediary). This section is not applicable here.

18

(2) an attorney licensed in any state.

(c) A person may not maintain an action in this state to recover a commission for the sale or purchase of real estate unless the promise or agreement on which the action is based, or a memorandum, is in writing and signed by the party against whom the action is brought or by a person authorized by that party to sign the document.

(d) A license holder who fails to advise a buyer as provided by Section 1101.555 [requiring that a license holder advise each buyer, in writing, that it should have abstract or title policy examined by an attorney or be provided with a title insurance policy] may not receive payment of or recover any commission agreed to be paid on the sale.

TEX. OCC. CODE ANN. § 1101.806 (Vernon 2012).

The RELA further provides:

A person acts as a broker or salesperson under this chapter if the person, with the expectation of receiving valuable consideration, directly or indirectly performs or offers, attempts, or agrees to perform for another person any act described by Section 1101.002(1), as part of a transaction or as an entire transaction.

*Id.* § 1101.004 (Vernon 2012).

Section 1101.002(1) defines "broker" as

[A] person who, in exchange for a commission or other valuable consideration or with the expectation of receiving a commission or other valuable consideration, performs one of the following acts:

(i) sells, exchanges, purchases, or leases real estate;

(ii) offers to sell, exchange, purchase, or lease real estate;

(iii) negotiates or attempts to negotiate the listing, sale, exchange, purchase, or lease of real estate;

19

(iv) lists or offers, attempts, or agrees to list real estate for sale, lease, or exchange;

(v) auctions or offers, attempts, or agrees to auction real estate;

(vi) deals in options on real estate, including buying, selling, or offering to buy or sell options on real estate;

(vii) aids or offers or attempts to aid in locating or obtaining real estate for purchase or lease;

(viii) procures or assists in procuring a prospect to effect the sale, exchange, or lease of real estate;

(ix) procures or assists in procuring property to effect the sale, exchange, or lease of real estate;

(x) controls the acceptance or deposit of rent from a resident of a single-family residential real property unit; or

(xi) provides a written analysis, opinion, or conclusion relating to the estimated price of real property if the analysis, opinion, or conclusion:

> (a) is not referred to as an appraisal;
> (b) is provided in the ordinary course of the person's business; and
> (c) is related to the actual or potential management, acquisition, disposition, or encumbrance of an interest in real property. . . .

*Id.* § 1101.002(1)(A) (Vernon 2012).

First, the only written agreement executed between Ryland and Weatherspoon was the MOU with its related "Business Relationship Guidelines," and all work performed by Weatherspoon pursuant to this written agreement—i.e., all work performed prior to August 29, 2006, when the trial court found the

contract was rescinded—was performed according to the terms of the MOU. These terms expressly provided that Weatherspoon was hired by Ryland "as an independent contractor to assist with business development and assignment execution." In this capacity, she was hired "to promote commercial real estate services." She agreed to "bring to Ryland . . . her customers, associations, and other business relationships to provide leads and other business opportunities for Ryland." Her compensation was to consist of a percentage of the fees earned by Ryland as a result of business secured by Weatherspoon for the provision of "technical skills and execution," as specified in subparagraphs 4(a) through (d) of the MOU, as well as fees earned from "[l]easing and sales where Vickie is the procuring cause and servicing associate" pursuant to subparagraph 4(e) of the MOU. There is no evidence in the record that the fees at issue in this litigation were earned for the provision of brokerage services because the work identified in Weatherspoon's invoice and by the witnesses' testimony did not fall into any of the statutory categories of brokerage activities. *See* TEX. OCC. CODE ANN. §§ 1101.002(1)(A), 1101.004 (describing brokerage services). They fell into the same categories as work previously performed pursuant to the MOU.

Second, even if Weatherspoon were seeking her share of the brokerage fees she agreed to share with Ryland, section 1101.806 of the RELA, by its plain language, does not apply an agreement to share compensation between license

21

holders. *See id.* § 1101.806(a)(1); *see also Puckett v. Burris*, No. 13-07-00703-CV, 2009 WL 4051975, at \*9, n.25 (Tex. App.—Corpus Christi Nov. 24, 2009, pet. denied) (mem. op.) (noting that section 1101.806, statute of frauds provision of RELA, does not apply to agreement to share compensation among license holders) (citing *Warren v. White*, 185 S.W.2d 718, 720 (Tex. 1945) and *Insignia Capital Advisors, Inc. v. Stockbridge Corp.*, No. 05-99-01126-CV, 2000 WL 267495 (Tex. App.—Dallas Mar. 13, 2000, no pet.) (mem. op.)).

Here, it is undisputed that Weatherspoon and Ed Ryland were both license holders. This dispute arose regarding their alleged agreement to share fees earned between them. Thus, even if a portion of the fees earned from Weatherspoon's activities were brokerage fees, section 1101.806 would not apply in this case.

Ryland also appears to argue that we must first determine whether Weatherspoon's claim against it is in essence a claim for a commission before we can determine whether section 1101.806 applies. However, because we have already determined that there is no evidence that the compensation due to Weatherspoon from Ryland was a share of fees earned by the provision of brokerage services; and we have also determined that, even if it were, section 1101.806 is inapplicable because the underlying dispute would still involve an agreement to share compensation between license holders. Therefore, we do not address this argument.

All of the case law relied upon by Ryland on this issue addresses situations in which a broker or other license holder sought payment of a commission from the seller of the property. *See, e.g.*, *Trammel Crow Co. No. 6 v. Harkinson*, 944 S.W.2d 631, 633 (Tex. 1997) (holding, in suit by real estate broker against seller, that broker's tort claims essentially sought to recover commission in absence of written provision and concluding that commission agreement must be in writing to be enforceable); *Sellers v. Gomez*, 281 S.W.3d 108, 112–15 (Tex. App.—El Paso 2008, pet. denied) (holding group of brokers could not recover from seller tort damages that were essentially a commission absent written and signed commission agreement). These cases are inapplicable here, as Weatherspoon is not seeking a commission or any other form of compensation from a seller of real estate.[5]

Because we conclude that, as a matter of law, section 1101.608 of the RELA did not prohibit Weatherspoon from seeking compensation under a theory of quantum meruit, we need not address the sufficiency of the evidence to support the jury's finding that Weatherspoon did not operate as a real estate agent at all times

---

[5]     The Texas Association of Realtors, in an amicus brief, also makes a passing reference to section 535.3 of Title 22 of the Texas Administrative Code, which governs provisions relating to the Texas Real Estate Commission's requirements of licensure and provides, "A salesperson may not receive a commission or other fee except with the written consent of the salesperson's sponsoring broker or the broker who sponsored the salesperson when the salesperson became entitled to the commission or fee." 22 TEX. ADMIN. CODE § 535.3 (2012). However, it fails to explain how this provision is applicable in the present case, and we hold that it is not, for the same reasons discussed above—namely, that Weatherspoon is not seeking a commission or fee from a buyer or seller of real estate.

while working for Ryland and that not all of her work was incidental to her work as a real estate agent.

## C.    Questions Two and Three

In response to questions two and three, the jury found that Weatherspoon performed compensable work for Ryland between August 29, 2006 and April 30, 2007 and that the reasonable value for that work was $40,000.

Quantum meruit is an equitable remedy based on an implied promise to pay for benefits received. *Bluelinx Corp. v. Tex. Constr. Sys., Inc.*, 363 S.W.3d 623, 627 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990)). "To prove quantum meruit, a party must show (a) valuable services were rendered or materials furnished, (b) for the person sought to be charged, (c) the services or materials were accepted and used by the person sought to be charged, (d) under such circumstances to reasonably notify the person to be charged that the party seeking recovery was expecting to be paid by the person sought to be charged." *Id.*

Here, the jury was instructed that "compensable work" occurs if one party renders valuable services or materials to another party who knowingly accepts and uses them and the party accepting them should know that the performing party expects to be paid for the work. *See id.* at 627 n.1; *see also Soto v. Seven Seventeen HBE Corp.*, 52 S.W.3d 201, 204 (Tex. App.—Houston [14th Dist.]

24

2000, no pet.) (holding that sufficiency of evidence must be reviewed using definitions and instructions contained in unobjected-to jury charge) (citing *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985)).

Weatherspoon testified that she spent 1,247 hours working on the Marathon Oil project and other matters for Ryland between August 29, 2006 and April 30, 2007. She also provided an invoice recounting the exact tasks and number of hours she spent on each task. The invoice reflected tasks such as advertising, clerical work, marketing work, purchasing supplies, developing budgets, attending meetings, and making copies, among many others. Ed Ryland also testified about various tasks that Weatherspoon completed during the relevant time frame.

Furthermore, Weatherspoon testified that she expected to be paid for the work she performed. She had anticipated earning a percentage of the fees paid to Ryland from the Marathon Oil contract under the terms of the MOU, but when the Marathon Oil contract went into effect in December 2006, Ryland paid her only $2,500 a month, after having paid her nothing but a portion of her expenses prior to that date. She informed Ed Ryland that she did not agree to that amount of compensation, and, by March 2007, her attorney sent Ryland a letter demanding that Weatherspoon be paid according to the MOU. Following the trial court's ruling that her August 2006 letter rescinded their earlier agreement and that the relevant time period for any recovery on her quantum meruit claim was August 30,

2006 through April 2007, she reevaluated her notes and other documents to detail the number of hours she spent working on various projects for Ryland.

Weatherspoon further testified that she provided help to Ryland in its services under the Marathon Oil contract and other projects, and it is undisputed that Ryland received a benefit from those projects. She testified that a person who performed the type of work she performed for Ryland in Harris County usually earned between $50 and $150 dollar per hour. Thus, she testified that she was seeking compensation from Ryland for $62,350—1,247 hours at $50 per hour. Weatherspoon's invoice also reflected a $12,500 credit for payments she had received from Ryland in December 2006 through April 2007.

We conclude that there is more than a scintilla of evidence to support the jury's conclusion that Weatherspoon performed compensable work and that the value of that work was at least $40,000. *See Bluelinx Corp.*, 363 S.W.3d at 627, n.1. We conclude that the evidence was legally sufficiency to support these findings. *See City of Keller*, 168 S.W.3d at 810, 827.

Ryland also argues that no contract existed between it and Weatherspoon after August 29, 2006, that Ed Ryland never agreed to compensate Weatherspoon at a different rate or change the characteristics of their relationship from that in the MOU, and that there was no agreed-upon compensation for any of the services performed by Weatherspoon. This is precisely the reason that Weatherspoon

sought recovery under a theory of quantum meruit—a theory she could not have pursued had a valid contract governed this aspect of their relationship.[6]  *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (holding that "[g]enerally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory" such as quantum meruit).  Ryland further argues that both parties understood their on-going relationship to be governed by the MOU.  However, the trial court found, pursuant to Ryland's own motion for summary judgment, that the MOU did not govern their relationship after August 29, 2006.  Thus, this evidence does not undermine the jury's verdict.

Ryland argues that Weatherspoon "failed to state what equitable wrongs [Ryland] committed which are the sources of [her] alleged loss" and that her own actions caused her loss.  However, recovery under quantum meruit does not require proof of an "equitable wrong."  *See Bluelinx Corp.*, 363 S.W.3d at 627 (providing elements for quantum meruit claim).  Furthermore, Ryland failed to plead or prove in the trial court any affirmative defense, such as unclean hands.

Ryland further argues that the "damage calculations at trial were incorrect and should not have included 960 hours of the 1,247 that Weatherspoon claimed in her invoice because she testified that the time period for her claim for those 960

---

[6]     The trial court rejected Weatherspoon's breach of contract claim, and she does not challenge this ruling on appeal.

hours "involved the time frame that was pre[-Marathon Oil] contract work." Additionally, it argues that we should discount Weatherspoon's testimony as a matter of law because it was contradictory.

However, Ryland misconstrues Weatherspoon's testimony. She testified that at one point—in a deposition that occurred prior to the trial court's ruling that she could not recover under the MOU and that the relevant time frame for any quantum meruit recovery was August 2006 through April 2007—she determined that she had spent 960 hours working on the Marathon Oil project prior to the time that contract went into effect in December 2006. Following the trial court's summary judgment ruling, she reevaluated her notes and other documents and created an invoice detailing the work she had performed on any project for Ryland, in conformance with the trial court's pre-trial rulings. Weatherspoon testified that some of the hours from the earlier 960-hour invoice overlapped with those claimed in the invoice she offered at trial, but that they covered different time frames and a different scope of work. The jury was the sole judge of the weight and credibility of Weatherspoon's testimony. *See City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.").

28

Ryland also complains about the amount Weatherspoon sought as reimbursement for expenses, as it believes Weatherspoon was not entitled to recover those amounts. However, Ryland did not object to the jury charge's definition of "compensable work" as "valuable services . . . rendered or materials furnished for another party who knowingly accepts and uses them," and we must evaluate the sufficiency of the evidence according to this unobjected-to instruction. *See Soto*, 52 S.W.3d at 204. We have already determined that the evidence was sufficient to support the jury's finding on this question.

We overrule Ryland's first issue.

### Evidentiary Complaints

Ryland complains in its second issue that the trial court erred in admitting the budget for the Marathon Oil project and the invoice created by Weatherspoon.

We review a challenge to the admissibility of evidence for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). To obtain reversal of a judgment based upon the improper admission of evidence, Ryland must show that the trial court committed error and that the error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). Error based on the admission of evidence is generally not reversible unless the appellant can demonstrate that the

29

judgment turns on the particular evidence excluded or admitted. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

Regarding the Marathon Oil budget, the trial court originally excluded the document after Ryland objected that it was irrelevant and potentially prejudicial to the jury. However, Ed Ryland testified during cross-examination that Weatherspoon agreed to be compensated at a rate of $2,500 per month because she placed such a figure in the Marathon Oil budget. The trial court subsequently allowed Weatherspoon to introduce a copy of the budget in order to establish that the budget did not contain the $2,500 figure.

A party opens the door to the admission of otherwise objectionable evidence offered by the other side when it "introduces the same evidence or evidence of a similar character." *Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 402 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (quoting *Sw. Elec. Power Co. v. Burlington N. R.R.*, 966 S.W.2d 467, 473 (Tex. 1998)). Ed Ryland opened the door to the admission of this document by testifying in a misleading manner about its contents. *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (stating that party opens door to admission of evidence of collateral matters when it injects those collateral issues into lawsuit); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000) (holding that evidence was admissible when defendant opened door through witnesses' testimony that

conveyed false impression). Thus, Ryland has failed to show that the trial court abused its discretion in admitting the budget. *See* TEX. R. APP. P. 44.1(a); *Camacho*, 298 S.W.3d at 638.

Ryland also argues that the invoice that Weatherspoon created to document the hours that she worked on various projects for Ryland should not have been admitted. However, prior to its objection to Weatherspoon's proffer of the invoice, Ryland itself had already sought and obtained admission of the invoice into evidence as its Exhibit 6. Thus, it waived any complaint regarding the trial court's subsequent ruling admitting the document at Weatherspoon's request. *See Banks v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 233 S.W.3d 64, 71 (Tex. App.—Dallas 2007, pet. denied) (holding that party waives complaint regarding admissibility of evidence when prior or subsequent testimony to same effect has been admitted without objection).

Furthermore, Ryland's argument that the invoice "lacked trustworthiness" because Weatherspoon created it more than three years after she performed the work and included hours for allegedly non-compensable work is likewise unavailing. Ryland cites *Freeman v. American Motorists Insurance Co.*, 53 S.W.3d 710 (Tex. App.—Houston [1st Dist.] 2001, no pet.), to support its argument that the invoice "was essentially a falsehood presented to the jury as 'evidence.'" In *Freeman*, this Court held that a doctor's letter submitted to a

party's attorney in the course of litigation did not qualify as a routine entry in the patient's medical history and was, therefore, inadmissible under the business-record exception to the hearsay rule. 53 S.W.3d at 714–15. This is not relevant to the issue here, however, where a witness who appeared at trial also submitted a document detailing the hours she worked, in corroboration of her testimony. Furthermore, we assume that the jury resolved any issues regarding the weight or credibility to be given to Weatherspoon's evidence regarding the hours she worked, either through testimony or the written invoice, consistently with its answers to the jury questions. *See City of Keller*, 168 S.W.3d at 819.

We overrule Ryland's second issue.

### Contract Rescission

In its third issue, Ryland argues that "[t]he trial court incorrectly ruled that [Weatherspoon's] rescission of the contract with [Ryland] resulted in a new agreement solely based upon [Weatherspoon's] letter and allowed th[e] introduction of testimony and evidence at trial based upon a presumption that a quasi-contractual relationship existed based solely upon [Weatherspoon's] letter."

The trial court ruled, in an interlocutory summary judgment on Ryland's motion, that Weatherspoon's August 29, 2006 letter rescinded the MOU. It does not appear that Ryland is challenging this ruling, which it requested. Rather, Ryland seems to be arguing that the trial court made a second ruling that a new

32

contract was formed. However, this contention is not supported by the record. The trial court did not find that Weatherspoon's August 29, 2006 letter created a new contract between the parties—in fact, the trial court ordered that Weatherspoon could proceed to trial on her "claim for unjust enrichment/quantum meruit" and dismissed with prejudice her breach of contract claims. *See Fortune Prod. Co.*, 52 S.W.3d at 684 (holding that "[g]enerally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory" such as quantum meruit).

Ryland further argues that the rescission of the contract extinguished the rights and liabilities of the parties and the parties "are restored to the same position that they would have occupied if the contract had never been made." However, Ryland's argument does not account for the uncontested fact that Weatherspoon continued working for Ryland after the contract was rescinded. Both Weatherspoon and Ed Ryland testified to this fact. "Quantum meruit 'is founded [on] the principle of unjust enrichment,'" which is "an implied-contract theory stating one should make restitution when it would be unjust to retain benefits received." *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 722–23 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985)). The rescission of the MOU does not relieve Ryland of its obligation to compensate Weatherspoon for

33

"compensable work" that she subsequently performed, with Ryland's knowledge and with the expectation that she would be compensated for that work. We have already determined that the jury's verdict on this issue was supported by the evidence.

We overrule Ryland's third issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Massengale, and Brown.