

# NUMBER 13-13-00269-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

COMPLETE OILFIELD MANAGEMENT
& MAINTENANCE, INC., D/B/A COMM
ENGINEERING,                                          Appellant,

v.

ALTA MESA SERVICES, LP AND ALTA
MESA HOLDINGS GP, LLC,                                Appellees.

---

### On appeal from the 24th District Court
### of Jackson County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Longoria
### Memorandum Opinion by Chief Justice Valdez

This appeal arises out of a suit for breach of contract. Appellant Complete Oilfield

Management and Maintenance Inc. d/b/a COMM Engineering ("COMM") brought suit

against appellees Alta Mesa Services, LP and Alta Mesa Holdings GP, LLC ("Alta Mesa")

for breach of a Gas Compressor Equipment Master Rental Agreement (the "Contract"). Under the Contract, Alta Mesa agreed to lease from COMM a Vapor Recovery Unit and a Booster Compressor to recover hydrocarbon vapor ("vent gas") at Alta Mesa's well facility. COMM claimed certain amounts for rent and connection/installation costs. In response, Alta Mesa brought a counterclaim for breach of contract alleging that COMM materially breached its contractual obligations because the Vapor Recovery Unit did not work. Alta Mesa claimed lost profits as a result of the nonworking Vapor Recovery Unit.

After a bench trial, the trial court entered a take-nothing judgment on COMM's claim for breach of contract and on Alta Mesa's counterclaim for breach of contract. The trial court further ordered that each party bear its own attorney's fees and court costs. COMM appeals the trial court's take-nothing judgment.[1] By four issues, which we reorganize as one, COMM challenges the legal and factual sufficiency of the evidence to support the trial court's finding that COMM failed to perform its obligations under the Contract and materially breached. COMM also challenges the trial court's denial of its request for attorney's fees. We affirm.

## I.  BACKGROUND

A Vapor Recovery Unit ("VRU") is a piece of oilfield equipment designed to capture vent gas that collects at the tops of crude oil storage tanks, between the liquid oil and the fixed roof of the tank. Vent gas has economic value in the natural gas marketplace. In early 2008, COMM measured significant amounts of vent gas at Alta Mesa's well facility.

---

[1] Alta Mesa did not appeal the trial court's take-nothing judgment on its counterclaim against COMM. The trial court found that "[Alta Mesa's] counterclaim for lost profits due to the failure of the VRU to function properly [was] precluded by the terms of the [Contract] between the parties."

COMM estimated that a VRU could recover 117 Mcf[2] (117,000 cubic feet) of vent gas per day, which it valued at approximately $580,000 annually.[3] Alta Mesa saw a "golden opportunity for an economic recovery" of these vapor gases and actively sought out companies to provide a VRU. Alta Mesa ultimately selected COMM over other competitors because COMM promised to deliver the VRU in the shortest amount of time. COMM subsequently entered into a Contract with Alta Mesa, agreeing to lease it a VRU that was capable of recovering up to 200 Mcf of vent gas each day. The purpose of the VRU was to recover gas at the facility that was below 100 pounds per square inch gauge ("PSIG"). In addition to the VRU, Alta Mesa agreed to lease a Booster Compressor. In contrast to the VRU, the Booster Compressor was designed to recover gas at the facility that was already at a pressure of at least 100 PSIG, including gas previously collected from the VRU.

COMM agreed to deliver both pieces of equipment—the VRU and the Booster Compressor—to Alta Mesa by June 11, 2008. However, actual delivery did not occur until August 2008. The evidence at trial showed that once the VRU was delivered to the facility, it started having problems—it would either recirculate gas or shut down entirely. Consequently, the VRU did not recover the volume of vent gas that COMM had promised. Alta Mesa turned to COMM for help, allowing COMM's personnel an opportunity to try to commission the VRU. Despite repeated attempts, COMM was unable to resolve the problem. At trial, the evidence showed that this was the first time COMM had attempted to install a VRU of its type in the field.

---

[2] "Mcf" is an abbreviation denoting a thousand cubic feet of natural gas.

[3] Alta Mesa estimated that an additional 65 Mcf per day could be recovered.

3

In late October 2008, Alta Mesa gave up on the VRU and returned it to COMM. Alta Mesa did not return the Booster Compressor. Still hoping to recover vent gas, Alta Mesa obtained a new VRU from another company, Hy-Bon. That VRU was installed onsite and, according to Alta Mesa, functioned as promised. By that time, however, Alta Mesa claimed it lost otherwise recoverable vent gas valued at approximately $282,199. Alta Mesa declined to pay COMM for its equipment and services. COMM sued Alta Mesa for breach of contract to recover amounts it claimed to be owed for rental payments and connection/installation costs. Alta Mesa responded with a counterclaim for breach of contract, seeking to recover its lost profits caused by the failure of the VRU.

After a two-day trial, the trial court signed a judgment that both sides take nothing and ordered each side to bear its own attorney's fees and costs. The trial court entered findings of fact and conclusions of law. The trial court found that COMM failed to prove that the VRU functioned as represented. In particular, the trial court found that Alta Mesa "made repeated attempts (both with and without the assistance of [COMM's] representatives) to utilize the VRU for its intended purpose. . . [but the] VRU never functioned properly [.]" This appeal followed.

## II. DISCUSSION

As previously mentioned, COMM challenges the legal and factual sufficiency of the evidence to support the trial court's express and implied findings that COMM failed to perform its obligations under the Contract and materially breached.

## A. Standards of Review

When, as here, a party with the burden of proof at trial brings a legal sufficiency issue complaining of an adverse finding, the party must show that the evidence

4

conclusively establishes all vital facts in support of the finding sought by the party. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). We first examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner,* 767 S.W.2d at 690. If no evidence supports the finding, we next examine the entire record to determine if the contrary proposition is conclusively established as a matter of law. *Id.* Evidence is conclusive "only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. In evaluating the legal sufficiency of the evidence to support a finding, we must review all of the evidence in the light most favorable to the prevailing party, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* at 827.

When a party with the burden of proof at trial complains that an adverse finding is factually insufficient, the party must demonstrate that the adverse finding is contrary to the great weight and preponderance of the evidence. *Dow Chemical*, 46 S.W.3d at 242. We weigh all the evidence, and can set aside a verdict "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* at 241. In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may believe one witness over another and resolve any conflicts or inconsistencies in the testimony. *See Brauss v. Triple M Holding GmbH*, 411 S.W.3d 614, 621 (Tex. App.—Dallas 2013, pet. denied). A trial court's findings of fact in

5

a bench trial have the same weight as a jury verdict and are reviewed for sufficiency under the same standards. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We must not substitute our opinion on witness credibility for that of the trial court. *City of Keller*, 168 S.W.3d at 819–20.

**B. Applicable Law**

A plaintiff alleging a breach of contract has the burden to prove (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damage as a result of the defendant's breach. *See Acceptance Ins. Co. v. Lifecare Corp.*, 89 S.W.3d 773, 782 (Tex. App.—Corpus Christi 2002, no pet.). "[W]hen a party to a contract seeks to enforce the agreement or to recover damages for breach of the agreement, that party must prove that it has performed all of its own obligations under the contract." *See Bernal v. Garrison*, 818 S.W.2d 79, 86 (Tex. App.—Corpus Christi 1991, writ denied).

A material breach by one party to a contract excuses the other party from any obligation to perform. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). Whether a breach is material generally presents a dispute for the factfinder to resolve. *See Cont'l Dredging, Inc. v. De–Kaizered, Inc.*, 120 S.W.3d 380, 394–95 (Tex. App.—Texarkana 2003, pet. denied) (citing *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex.1983)).

**C. Analysis**

The trial court expressly found that the VRU "never functioned properly" and entered a take-nothing judgment on COMM's claim for breach of contract. However, the trial court did not identify which party—COMM or Alta Mesa—was responsible for the

6

VRU's failure. Although the trial court did not expressly attribute the VRU's failure to COMM, the take-nothing judgment against COMM implies a finding that COMM did not substantially perform under the Contract—or materially breached—by failing to supply a properly functioning VRU, which then had the effect of excusing Alta Mesa's performance. *See Mustang Pipeline*, 134 S.W.3d at 200 (observing that when one party to a contract commits a material breach, the other party is excused from further performance). COMM challenges the legal and factual sufficiency of this finding on appeal.

## 1. Source of VRU's Failure

At trial, both parties argued that the other party was responsible for the VRU's failure. Alta Mesa argued that COMM was responsible for the VRU's failure. In support of this position, Kevin Bourque, Alta Mesa's engineer, testified that the VRU was defective upon delivery because an internal component—called a "suction regulator"—was not working properly in the unit. COMM, on the other hand, attempted to show that the VRU failed because Alta Mesa did not provide suitable operating conditions at the facility. According to COMM, the VRU worked some of the time and attributed the VRU's intermittent failure to the actions (or inactions) of Alta Mesa under the following four theories:

i.  Alta Mesa's "Big Joe Regulator" malfunctioned and failed to provide "suitable, sweet, dry natural gas fuel," in the form of consistent gas pressure (at 90 PSIG) to run the emergency scrubber's pneumatic pump, the level control switch and recycle valve on the VRU, thus causing the VRU to "function intermittently."

ii.  Alta Mesa failed to provide an "inlet separator," thus allowing liquids and sand or "black gunk" to enter the VRU.

iii.  Alta Mesa injected liquid chemical acids directly into the VRU.

7

iv. Alta Mesa failed to provide gas with zero percent hydrogen sulfide ($H_2S$) and carbon dioxide ($CO_2$), and the presence of these chemicals corroded certain seals on the scrubber's pump.

COMM argues that the evidence supported each of these theories and conclusively proved that Alta Mesa was responsible for the VRU's failure.

### a. Legal Sufficiency

Under our legally sufficiency review, we need not evaluate the validity of COMM's theories if the record supports a finding that COMM was responsible for the VRU's failure. *See Dow Chem. Co.*, 46 S.W.3d at 241 (directing that appellate review of the entire record is necessary only when there is no evidence to support the finding being challenged); *Sterner*, 767 S.W.2d at 690. Here, we find evidence in the record—primarily through the testimony of Bourque—to support a finding that COMM delivered a VRU that did not work because of a faulty suction regulator component in the unit. Additionally, the record bears no indication that COMM conclusively negated Alta Mesa's suction-regulator theory as an explanation for the VRU's failure. Having found some evidence in the record to support a finding that COMM was responsible for the VRU's failure, we cannot conclude that this finding is legally insufficient. *See id.*

### b. Factual Sufficiency

COMM also argues that the trial court's implicit finding regarding the cause of the VRU's failure is factually insufficient. In view of the entire record, we now turn to the evidence that purportedly supports COMM's four theories regarding the cause of the VRU's failure, and the evidence that contradicts those theories.

### i. Consistent Gas Pressure at 90 PSIG

First, COMM maintains that the VRU failed because Alta Mesa's "Big Joe Regulator" malfunctioned and did not provide "suitable, sweet, dry natural gas fuel for engine use"—meaning fuel with a consistent pressure of 90 PSIG—as required by Section 8(f) of the Contract. In support of this theory, Bill Schneider, COMM's president, testified that there was intermittent inadequate gas pressure in the system. James Welch, COMM's mechanical instrumentation specialist, also testified that there was inconsistent gas pressure in the system. However, Bourque testified that he did not "recall pressure fluctuation" over the period of time at issue. Bourque further testified that COMM never raised any issues regarding the allegedly inconsistent instrument gas pressure until well after the fact. If COMM had done so, Bourque testified, Alta Mesa would "have addressed it and corrected it." According to Bourque, the same engine gas used to run the VRU was also used throughout the facility, and would have caused problems with other on-site equipment if the pressure had not been consistent:

> [The Big Joe Regulator controls] the fuel and instrument gas that run the entire facility, so during the course of operation if it would have had a problem with one set of, piece of equipment, the same big Joe sticking open or sticking closed would have caused problems with all the other equipment and we didn't have any other issues.[4]

Schneider also confirmed that the other equipment—for example, the Booster Compressor—ran without difficulty:

> Q:     Mr. Schneider, why did the [B]ooster [C]ompressor work with the fuel gas that was being supplied?
>
> A:     It's a natural gas engine and it can burn the fuel with no problem. It had no issues with any contaminants or anything—that I know of—you know, over time things happen with the corrosiveness in the

---

[4] Bourque admitted that Alta Mesa's Big Joe Regulator was having some problems but clarified that it was common in the field to regularly replace that part. Bourque then reiterated that, had the problems with the Big Joe Regulator affected pressure consistency, it would have impacted the performance of other equipment at the facility well.

9

> gas—the H2S and CO2—and maybe just didn't operate, but it worked fine for the time that we had it on location.

> Q:     And it was being used for fuel?

> A:     For fuel to the engine that was driving the compressor, the bigger compressor.

This evidence undercut Schneider and Welch's claims of inconsistent gas pressure. The trial court, as the factfinder, was within its authority to believe Bourque's testimony over that of Schneider and Welch. *See Brauss*, 411 S.W.3d at 621. Finally, COMM's contention that Alta Mesa failed to provide suitable operating conditions at its facility was undercut by the fact that Alta Mesa later obtained and installed a fully-functioning VRU from Hy-Bon. The replacement Hy-Bon VRU was fully functional, and there is no evidence that Alta Mesa changed its operating conditions. It was reasonable for the trial court to infer that this subsequent, successful installation confirmed that the problem lay with COMM's VRU, not with inconsistent gas pressure or Alta Mesa's operations. Accordingly, the trial court properly rejected COMM's first theory that the VRU failed because of inconsistent gas pressure. Regarding this theory, the trial court's decision was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 241.

### ii.    Inlet Separator

Second, COMM maintains that the VRU failed because Alta Mesa did not provide an inlet separator to remove solids (such as sand) and liquids from the gas stream, as required under Section 8(b) of the Contract. Although Schneider testified that Alta Mesa did not supply an inlet separator, Bourque testified as follows regarding the storage tanks at the facility serving as inlet separators, separating liquids, solids, and gases:

Q:      Okay. As far as [COMM's counsel] was asking you questions about whether or not there was [an] inlet separator. What effect, what's the purpose of the [storage] tank?

A:      The [storage] tank is the same configuration as the separator.

Q:      And what does it do?

A:      It allows the liquids and the gases to separate, the solids, gravity separate out and fall out to the bottom of the [storage] tank.

Q:      Would that include sand?

A:      Yeah, anything.

Bourque explained that while the crude oil sits in each tank, the forces of gravity work to separate liquids, solids, and vapors. Due to gravity, any sand or other solid material in the crude oil naturally sinks to the bottom, and it is therefore "impossible" for sand to reach the top of the tanks. The trial court, as the fact finder, was allowed to believe Bourque's testimony that the storage tanks served as inlet separators over Schneider's testimony to the contrary.[5]

COMM argues that the presence of sand in the VRU conclusively proved that Alta Mesa failed to provide an inlet separator—thereby rendering Bourque's testimony that

---

[5] COMM argues that we may not consider Bourque's testimony that storage tanks served as inlet separators because it was extrinsic evidence that varied the contractual term "inlet separator" in violation of the parol evidence rule. We disagree. "Although extrinsic evidence is generally not admissible to vary the terms of an unambiguous agreement, extrinsic evidence may 'be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to 'interpret' contractual terms.'" *See Contreras v. Clint Indep. Sch. Dist.*, 347 S.W.3d 413, 419 (Tex. App.—El Paso 2011, no pet.)(quoting *Mescalero Energy, Inc. v. Underwriters Indem. General Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)); *Ferguson v. DRG/Colony N., Ltd.*, 764 S.W.2d 874, 883 (Tex. App.—Austin 1989, writ denied); *see also XCO Production Co. v. Jamison*, 194 S.W.3d 622, 629 n.4 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (determining that expert tax lawyer's interpretation of terms in partnership agreement was admissible to explain—not vary—their specialized meaning); *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995). Here, Bourque's testimony that storage tanks served as inlet separators demonstrated compliance with, and explained, the Contract; it did not, as COMM argues, "vary the terms" of the Contract. Because the parol evidence rule does not bar consideration of Bourque's testimony, we may consider it in determining whether the trial court properly rejected COMM's theory that the VRU failed because Alta Mesa allegedly did not provide an inlet separator.

11

Alta Mesa provided an inlet separator incompetent and not appropriate for our review. We disagree. In *City of Keller*, the Texas Supreme Court explained that certain types of testimony could be rendered incompetent by physical evidence, such as where "an eyewitness's location renders a clear view of an accident 'physically impossible,'" and is therefore "no evidence of what occurred, even if the eyewitness thinks otherwise." 168 S.W.3d at 812. Similarly, if expert testimony is "based on certain assumptions about the facts, [a court] cannot disregard evidence showing those assumptions were unfounded." *Id.* at 813. Here, there is no conflict between Bourque's testimony and the physical evidence regarding the presence of sand. Rather than testifying that no sand was present in the unit, Bourque testified that the unit "sat on a pile of sand" and there was "no indication of the source" of the sand found in the VRU. COMM never established the origin of the sand, either. Without knowing the source of the sand, there is no way of determining whether Alta Mesa was responsible for its presence in the VRU, or whether an inlet separator could have captured any sand before it entered the VRU. Thus, contrary to COMM's contention, Bourque's testimony that Alta Mesa provided an inlet separator was not rendered incompetent by physical evidence that sand got into the VRU. *See id.*

For these reasons, the trial court's rejection of COMM's second theory—that the VRU failed because Alta Mesa did not supply an inlet separator—was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 241.

### iii. Liquids in the VRU

12

Third, COMM maintains that the VRU failed because Alta Mesa injected "liquid chemical acids" used to treat H2S into the unit, and that a properly functioning inlet separator could have prevented these liquids from damaging the VRU. However, the record indicates that liquids were first reported in October 2008, approximately three months after the equipment was delivered in August 2008 and malfunctioned. Schneider conceded that he was not aware of any reports of liquids prior to October 2008:

Q: You're not aware of liquid being in the twin scroll unit other than the end of October; true?

A: Well, I think there was multiple field tickets that talked about liquids in the instrument gas throughout the month of October.

Q: Throughout the month of October?

A: Yes, during the time we came back on line and the time of failure.

Q: Okay. But not prior to that time?

A: I'm not aware of any reports other than that time.

Additionally, Bourque testified that the VRU had problems "from day one"—in August 2008—and that liquids were not injected into the unit until mid to late October 2008—"towards the end." Thus, the presence of H2S treatment solution in the system in October could not explain why the VRU did not work in August and September. Moreover, to the extent that this apparent timing problem does not rule out COMM's liquid theory as an explanation for the VRU's failure, we agree with Alta Mesa that the evidence supported a finding that the liquids alleged to have cause VRU to fail would not have entered the VRU unless COMM furnished a faulty emergency scrubber. Bourque testified that the emergency scrubber was designed to remove liquids from the VRU at a rate of

13

1.5 gallons per minute, and that he was aware that ten gallons of H2S treatment solution was being injected into the VRU. Bourque testified:

> Q. Do you know how much [the emergency scrubber] would handle?
>
> A: About a gallon and a half a minute.
>
> Q: And you heard that maybe at some point in time, possibly not from it being injected in the header, but that it was [ten] gallons a day?
>
> A: Yes.
>
> Q: Would that pump be able to handle [ten] gallons a day?
>
> A: Yes, it should.

Thus, a working emergency scrubber would have been able to remove the quantity of liquid in the VRU. In addition, Bourque testified that a "high level shut off" switch on the system should have prevented any liquid from reaching the VRU, even if the emergency scrubber failed. Bourque explained that, if liquid surpassed a low level switch in the pump, then a high level switch should have shut down the entire VRU system, but that switch did not work either. According to Bourque, this equipment did not work properly because COMM had improperly configured it:

> Q: And you were questioned by [COMM's counsel] about why the pump didn't come on when that switch was activated and what was the reason?
>
> A: I believe it was because the pressure for the supply to move that— to make the pump actuate, it's pneumatically actuated—was equal to the discharge pressure that the liquid line was trying to go to so it would just sit there. It wouldn't actually move.
>
> Q: Because it was improperly connected?
>
> A: Correct. Once we corrected it and moved it to the water tank and not to the low-pressure separator, it moved liquid with the new pump.

Finally, while Schneider testified to his belief that liquids caused the VRU to fail, COMM provided no testing, analysis, or independent expert testimony to substantiate this belief. For these reasons, the trial court properly rejected COMM's theory that the VRU failed because Alta Mesa injected liquids into the unit, and its decision was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 241.

### iv.    H2S and CO2

Finally, COMM theorizes that the VRU failed because Alta Mesa did not eliminate all hydrogen sulfide (H2S) and carbon dioxide (CO2) from the incoming fuel gas. According to COMM, the presence of these chemicals corroded the interior elastomer seals in the VRU and caused the unit to function improperly. This theory presupposes that H2S and CO2 levels were actually present in the fuel gas—a proposition that finds conflicting factual support in the record. Concerning CO2, we note that COMM, in its appellate brief, does not specifically reference CO2 levels or point this Court to any evidence in the record about CO2. Instead, COMM focuses solely on H2S levels. Concerning H2S levels, Schneider acknowledged on cross-examination that he had never seen any report stating that H2S was present in the fuel gas:

Q:    [Y]ou know of no test that you can point to, you can point the Court to where there was a finding of H2S in the fuel gas?

A:    I don't have a physical report, yes, sir.

Bourque also confirmed that no H2S was present in the VRU, and that the VRU's malfunctions were not caused by H2S:

Q:    And the pipeline company checks that gas on a monthly basis for any H2S content?

A:    Correct.

Q:    And did they ever show any H2S content in what is essentially the instrument gas?

A:    No, they did not.

Bourque further testified:

Q:    Okay. Do you believe that the problems with the COMM unit were in any way related to H2S?

A:    No, I do not.

Q:    Can you say that with a degree of certainty?

A:    I feel very confident there's no H2S issues. We don't have any test reports showing H2S in the unit. We don't have any lab analysis showing H2S contamination or corrosion.

. . .

Q:    Okay. And any other equipment at the location, did you ever have any H2S issues on that equipment?

A:    I did not.[6]

COMM responds that Monroe Schroeder, Alta Mesa's chemical supplier, testified that he treated the fuel at the facility for H2S. While this may be true, Schroeder also

---

[6] COMM, relying on *City of Keller*, contends that the testimony—particularly Bourque's—regarding the absence of H2S was rendered incompetent by "conclusive" physical evidence of corrosive damage to the seals. *See* 168 S.W. 3d at 812. We disagree. This is not a case where the testimony alleged to be incompetent was contrary to the conclusive physical evidence. The reason, as Alta Mesa notes, is that Bourque did not deny that the seals were corroded; instead, he testified that the corrosion was not due to the presence of H2S in the fuel gas. Because Bourque did not deny the existence of corroded seals, but testified only as to their cause, we are not persuaded that Bourque's testimony contradicted conclusive physical evidence. Accordingly, we do not believe that Bourque's testimony concerning the absence of H2S can be deemed "incompetent" under *City of Keller*. *See id.*

16

testified that there was no H2S in the vent gas after the treatments, and that there were never any positive tests for H2S.[7]

Moreover, as Alta Mesa points out in its appellate brief, even if H2S were present in the system, that fact would not explain the corroded seals. Bourque testified that it would have taken years for H2S to corrode the seals, and therefore would not have caused the corrosion found in the VRU over the three-month period that the unit was housed at Alta Mesa's facility. In addition, COMM's evidence did little to contradict Bourque's testimony, as Schneider testified that corrosion was "*consistent* with H2S exposure," but did not testify that there was a *causal* relationship. (Emphasis added.) Likewise, Welch could not determine the cause of the corrosion:

Q:      Did you later see the actual liquid transfer pump?

A:      Yes.

Q:      Did you examine it? What did you see?

A:      *We really didn't know what was, basically, what was the cause*, but the elastomers were dissolved, they were eat[en] up.

(Emphasis added.) Thus, evidence of H2S's slow corrosive effect was not consistent with COMM's theory that H2S caused the corrosion found in the seals. Accordingly, the trial court properly rejected COMM's fourth theory that the VRU failed because Alta Mesa did not eliminate all H2S and CO2 from the incoming fuel gas; its decision was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 241.

### v.      Summary

---

[7] We note that Bourque confirmed that Alta Mesa had no problems with H2S in the well after the COMM VRU was replaced with the Hy-Bon VRU.

In view of the entire record, we cannot conclude that the trial court's rejection of all four of COMM's theories concerning the cause of the VRU's failure was so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See id.* Therefore, the evidence was factually sufficient to support a finding that COMM—not Alta Mesa—was responsible for the VRU's failure. *See id.*

## 2. Substantial Performance

COMM further argues that the trial court's implied finding that COMM did not substantially perform is legally and factually insufficient. Specifically, COMM asserts that, despite its problems, the VRU was not a complete failure, but instead worked some of the time. Relying on this premise, COMM maintains that its overall performance under the contract was not insubstantial because the Booster Compressor—which recovered vent gas without any problems—was capable of recovering 70% of the vent gas at the facility. Thus, according to COMM, Alta Mesa lost no more than 30% of recoverable vent gas on account of the problems with the VRU.

To support its position that the VRU worked some of the time, COMM relies on Schneider's testimony that the VRU's filter was filled with "black gunk" after it was in "recovery mode," meaning, according to COMM, that the VRU was "recovering vent gas and sending it to the Booster Compressor."[8] However, on cross examination, Schneider testified that the VRU was never in operation. Schneider testified:

Q: And are you saying, as we've been saying all day, that it was never in operation?

A: You talking about fully commissioned? In other words, totally operating, we've left the facility and everything is operating fine? That never happened.

---

[8] Specifically, Schneider testified: "We know it was operating because I had people there that witnessed it operating and this evidence shows that it picked up that black solid from somewhere."

18

Q:     It never happened.  It never got fully commissioned?

A:     Yes, sir, correct.

Moreover, Bourque testified that the VRU never recovered any vent gas; so did Schroeder, who testified that he never observed the VRU working.  Faced with this factual conflict, the trial court was entitled to discredit Schneider's testimony—which itself was internally inconsistent—in favor of the testimony of Bourque and Schroeder, both of whom had first-hand knowledge that the VRU never worked and never recovered any vent gas. *See Griffin Indus., Inc. v. Honorable Thirteenth Court of Appeals*, 934 S.W.2d 349, 355 (Tex. 1996) ("In a nonjury trial . . . , the trial court is the sole judge of the witness' credibility and the testimony's weight . . . . The trial court, as fact-finder, has the right to accept or reject all or any part of any witness' testimony. The trial court may believe one witness and disbelieve others."); *Banks v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 233 S.W.3d 64, 68 (Tex. App.—Dallas 2007, pet. denied) ("It is the [fact finder's] role to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses").  Therefore, the evidence was not conclusive that the VRU worked some of the time; nor was a contrary finding against the great weight and preponderance of the evidence.  *See Dow Chemical*, 46S.W.3d at 241.

In any event, even if we were to assume that the VRU recovered vent gas some of the time, it would not conclusively or overwhelmingly establish that COMM substantially performed its contractual obligation.  Texas courts rely on the Restatement (Second) of Contracts factors to determine whether a party to a contract substantially performed.  *See Mustang Pipeline*, 134 S.W.3d at 199 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241).  As applied to the instant case, these factors include:  (a) the extent to which Alta

19

Mesa will be deprived of the benefit which it reasonably expected; (b) the extent to which Alta Mesa can be adequately compensated for the part of the benefit of which it was deprived; (c) the extent to which COMM will suffer a forfeiture; (d) the likelihood that COMM will cure its failure, taking account of the circumstances including any reasonable assurances; and (e) the extent to which COMM's behavior comports with standards of good faith and fair dealing. *See id.* We now turn to a consideration of these factors.

Regarding the first factor, Alta Mesa presented evidence that the problems with the VRU caused it to lose vent gas valued at $282,199 in the period between the June 11, 2008 delivery date and October of 2008. The loss of this benefit is significant, which Alta Mesa reasonably expected to receive. And while COMM maintained that the VRU worked some of the time, it made no attempt to challenge or reduce the value of this loss. Regarding the second factor, Alta Mesa cannot expect to be adequately compensated for the value of the lost vent gas because the Contract does not allow Alta Mesa to recover lost profits. Regarding the third factor, we agree with Alta Mesa that the loss to COMM is relatively insubstantial, as COMM likely would not have been able to re-lease the defective VRU to another company for a profit.[9]

The fourth factor—the likelihood that COMM will cure its failure—favors Alta Mesa. The evidence showed that COMM attempted to resolve the problems with the VRU over the entire three-month period, but was never able to fully commission the unit. COMM responds that it offered to replace the VRU at no cost to Alta Mesa, and that Alta Mesa

---

[9] Additionally, as Alta Mesa points out, COMM calculates its loss at approximately $315,157.97, not including attorney's fees. However, in its petition, COMM sought to recover a principal sum of only $201,306.56. Even accepting the new amount at face value, we agree with Alta Mesa that COMM's loss is nearly equivalent to the revenue that Alta Mesa lost as a result of the non-functioning VRU. Thus, relative to Alta Mesa's loss, we cannot conclude that COMM's loss or forfeiture can be characterized as substantial.

20

refused COMM's offer. While this may be true, there is no indication that COMM gave any assurance to Alta Mesa that a replacement VRU would have fared any better than the first VRU, which COMM admits was never fully commissioned. Moreover, by the time COMM offered to replace the VRU, Alta Mesa had already acquired a substitute from Hy-Bon.

Finally, the fifth factor favors COMM. Alta Mesa never alleged that COMM acted in bad faith. Instead, Alta Mesa complained only that COMM's offer to replace the VRU came "too late."

Weighing these factors, we cannot conclude that COMM's performance was conclusively established as "substantial," or otherwise supported by the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 241. Because COMM did not prove that it substantially performed its obligations under the Contract, Alta Mesa's performance was excused as a matter of law. *See Mustang Pipeline Co.*, 134 S.W.3d at 196 ("[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").[10] We therefore conclude that the evidence was legally and factually sufficient to support the

---

[10] In several related sub-issues, COMM contends that Alta Mesa breached certain provisions of the Contract, including those requiring it to (1) pay all connection and commissioning costs for the VRU and Booster Compressor pursuant to Section 7 of the Contract; (2) pay for damages to the VRU associated with "use" of the equipment pursuant to Section 5 of the Contract; (3) pay all rent due as a result of alleged events triggering a default pursuant to Section 13 of the Contract. We reject these arguments. These provisions are not enforceable unless COMM performed its obligation under the Contract. *See Mustang Pipeline Co.*, 134 S.W.3d at 196. Put simply, Alta Mesa was not obligated to perform because COMM materially breached the Contract. *Id.* We also reject COMM's related argument that Alta Mesa was obligated to pay rent for the entire 12-month term of the Contract because it accepted the equipment without providing written notice of any defects to COMM within 48 hours of receiving the equipment, as provided under Section 4 of the Contract. COMM presented no evidence that Alta Mesa failed to provide timely, written notice of the defective VRU. In any event, the evidence showed that Alta Mesa was in communication with COMM as soon as it became clear that its VRU was not working.

trial court's finding that COMM failed to substantially perform its obligations under the Contract and materially breached.[11]

### III.  CONCLUSION

We overrule COMM's issues and affirm the judgment of the trial court.


**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
29th day of May, 2015.

---

[11] In a final sub-issue, COMM argues that the trial court erred in denying its request for attorney's fees in the amount of $93,864.86.  Because we have found that trial court entered a valid take-nothing judgment on COMM's claim for breach of contract, we need not address its claim for attorney's fees.  *See Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); TEX. R. APP. 47.1

22